[No. 1302.]

## GEORGE WEDEKIND, RESPONDENT, *v.* SOUTHERN PACIFIC COMPANY, A CORPORATION, APPELLANT.

ACTION TO RECOVER DAMAGES—INJURY TO PASSENGER—SUFFICIENCY OF EVIDENCE.—Plaintiff claimed to have been ruptured, while a passenger on defendant's train, by a collision. The train on which defendant was riding, he being seated in a rear car, was run into from behind by a train running at the rate of from one to three miles per hour. The pilot slid under the hind end of the rear car, raising it up about eight or ten inches, and shoving the entire train about twenty feet. Plaintiff testified that his first sensation was a push in his back, and was then thrown on his stomach on the back of the seat in front, and he sank down between the seats, becoming insensible; that when he came to he tried to get up, and found that he could not use his right arm; that he managed with difficulty to get out of the car, and with the assistance of some one unknown to him he got into another car; that he felt terrible pains in his groin, and that it was only by pressing the affected part that he obtained any relief; and that he kept his hand pressed against that part until he reached his destination. A passenger and several of the defendant's employes testified that the shock was not severe enough to disturb any one; that after the accident they made inquiries all through the train as to whether any one was hurt, but heard no complaints. The medical experts testified that rupture could have been produced by such an accident. Witnesses also testified to complaints by plaintiff after reaching Reno, and visits to physicians, and his subsequent condition as compared with his former. *Held*, that the evidence was sufficient to justify the jury in finding that plaintiff had been hurt in the collision.

IDEM—AMOUNT OF DAMAGES.—Plaintiff was fifty-eight years of age, engaged in the piano trade, which required some lifting. He testified that he had been unable to do any work after the accident; that he had earned before that time $300 per month. The experts agreed that the effect of the rupture would be to prevent violent exercise, and would to some extent deprive the person injured of the physical strength required to earn a living, though some testified that it would not shorten life. *Held*, that a verdict for seven thousand dollars would not be disturbed.

APPEAL from the District Court of the State of Nevada, Washoe County.

*R. R. Bigelow*, District Judge.

*Baker & Wines*, for Appellant.

*J. F. Alexander* and *R. H. Lindsay*, for Respondent.

By the Court, HAWLEY, C. J.:

The appeal in this case is taken from a judgment in favor of respondent for seven thousand dollars damages for injuries received by him while a passenger on appellant's cars, in a collision which accurred at Wadsworth on the 22d day of December, A. D. 1887, and from the order of the district court refusing a new trial. The case seems to have been properly and well tried. No complaint is made against any of the instructions given by the court. No exception against the admissibility of evidence is presented for review. No error of law is claimed to have occurred during the trial. The motion for new trial was based solely upon the ground of "insufficiency of the evidence to justify the verdict of the jury," and this is the only ground upon which appellant relies for a reversal.

The position of appellant is clearly pointed out in the assignment of errors, to wit: "That there is an overwhelming preponderance of the evidence to the effect that the plaintiff was never injured at all upon the train of defendant, and that the evidence of the plaintiff stands alone and uncorroborated as to receiving such injuries while upon the defendant's cars as a passenger, and is so unreasonable and improbable as to be entitled to no weight. All the other witnesses who were present at the accident contradict the plaintiff flatly as to the circumstances attending it, and also that he was not and could not have been injured in the manner in which he states."

Can this position be maintained? Is it sustained or justified by the evidence? From the record on appeal, it appears, from the testimony of witnesses introduced by appellant, that the colliding trains numbered respectively, two and four, were each composed of eight cars, and that each car weighed about forty thousand pounds; that the engine attached to train two weighed thirty-six tons; that train four, on which respondent was a passenger and seated in the rear car, was standing still at Wadsworth; that the engineer of train two saw train four when he was about two hundred and twenty or two hundred and forty feet away, and was then running his train at a rate of speed of about six or eight miles an hour; that he immediately reversed his engine, and applied the air-brakes, and by this means reduced the rate of speed so that at the time of collision the rate was not greater than from one to three miles an hour; that

the pilot or cow-catcher of the engine, attached to his train, slid under the hind end of the rear car of train four, and raised it up about eight or ten inches, and shoved the entire train ahead about twenty feet; that the king-bolt that coupled the truck to the rear coach, which was about two feet long and about two inches in diameter, was bent by the force of the collision.

With reference to the immediate effect of this collision upon respondent, he testified in his own behalf as follows: "The first thing I felt was a push in my back, which threw me against the back of the seat. Then a second blow came from the other way, and I was thrown on my stomach on the back of the seat in front, and I sank down between the seats and became insensible. When I came to my senses I thought I heard some one dragging a box or something like that through the car. I called to whoever it was, but they did not hear me or did not notice me. I then tried to get up, and found I could not use my right arm. After trying awhile, I managed to pull myself up by taking hold of the seat in front of me with my left hand. I managed then with difficulty to get out of the car on to the platform, and some one, whom I don't know, helped me to put my overcoat on. I then, with help, got into the car which brought us to Reno, and sat down in one of the seats. The perspiration poured down off my forehead, and I felt a tremendous pain and burning sensation in my groin. I rolled my handkerchief up in a round ball, and pressed it against my belly. This seemed to give me relief. Afterwards I put my pocket-book down there, and pressed it against where the pain was, and in that way I got to Reno." There is no denial of this testimony, save the attack inferentially made upon it as to its improbability. Dr. T. C. Hanson, who was at the time of the collision in the last seat of the rear car on train four, facing the colliding engine, testified, in appellant's behalf, "that there was no jar or shock sufficient to disturb any person in his seat, and not as severe as the ordinary jerk in starting up a train. It was a kind of a pushing sensation—not so severe as a jerk in a sudden start. I was not materially disturbed in my seat, but thrown forward a little, and I did not rise from my seat until I noticed the car commenced to raise a little, I then got up, and went to the front of the car. There was only one shock, and a second shock testified to by the plaintiff

is a mistake. The collision occurred in this way: The engine of the rear train, by its pilot, ran under the rear car that I was in, and raised it up a little — about eight or ten inches — and pushed it forward at the same time. There might have been perhaps from six to ten people in the car. There was no light put out or windows broken, except a glass in the rear door, and no damage done to the stove whatever, and no smoke in the car that I could discover. I walked through the car immediately, and there was no person thrown down. If there had been, I certainly should have seen them. I inquired of everbody in the car if there was anyone hurt, and no one claimrd to be injured, and there was no complaint from any person, except one person said he had a scratch on his face, and in a jocular way said he was going to sue the company. I came on to Reno in the smoking car with all the passengers, who had been transferred from the rear car, and saw nobody who pretended to be injured, and heard no complaint from any person during the remainder of the trip to Reno. There was no jar by the collision that would throw a person out of his seat in any manner whatever. If a person was sitting in his seat facing the front of the car, the jar being from the rear, he would simply feel some jar, at his back, and there was no shock which could possibly throw him forward in his seat." This witness also testified that he "was looking out of the back window, saw the head-light, and heard the train (No. 2) coming, and did not move until the collision took place."

It is evident from the verdict that the jurors believed the testimony of respondent as to the force of the shock to be true. They were the judges of the credibility of the respective witnesses, and had the right, and it was their duty, to consider all the facts and circumstances as testified to by the witnesses, in order to determine the reasonableness or probability of the testimony given by any particular witness. There was testimony given by some of the employes of appellant tending to corroborate the statements made by Dr. Hanson as to the force of the collision, and that no one complained of being hurt. The engineer on train two testified that the shock the train received was not sufficient to throw a person out of his seat, or down between the seats. Louis and William Jenkins, car-inspectors for appellant, were standing near the rear car of train four when the collision occurred, and imme-

diately got into and went through the car to inquire and ascertain if any one was injured. Both testify that there was no one that pretended to be hurt, and William Jenkins testified that "there was no one thown down between the seats or in the aisle, or any other place in that car. It is not possible that any one was thrown down upon the floor of that car in an insensible condition and me not to have seen them, as I went in there to look for that purpose." The conductor on train two, who was standing on the platform between two sleepers, said that the effect of the collision was to throw him up against the end of the sleeper, but not violently. " I was not thrown sufficiently hard .against the end of the sleeper to bruise me in any way whatever."

Now, the testimony of these witnesses, while tending in some respects to corroborate the testimony of Dr. Hanson, clearly shows that there was a commendable zeal manifested by the employes of appellant, as well as by Dr. Hanson, to ascertain if any one was injured. That was the first thought. They were evidently of the opinion, at that time, that some of the passengers might be injured. If the force of the collision was not "as severe as the ordinary jerk in starting up a train," the jury might have thought it strange that such immediate and universal inquiry was made as to whether any of the passengers were injured. If that was the extent of the collision, was it reasonable to believe that every person who saw or felt the shock should immediately inquire if any one was hurt? The jury might, also, have believed from the testimony that a train of cars with an aggregate weight of three hundred and ninety-two thousand pounds, moving at the rate of from one to three miles an hour, coming in contact with a train of like weight stan ling still, and shoving it twenty feet forward, might have had force enough to throw a person in the car out of his seat in the manner described by the respondent, and that his testimony, in this respect was neither improbable nor unreasonable. Again, if the force of the shock was strong enough to throw the conductor on the train two up against the end of the car might it not have been sufficiently strong to have raised respondent out of his seat? In this connection the jury may have considered that, notwithstanding the fact that several persons passed through the car, and heard no complaint that any one was injured, not one of the witnesses for appellant ap-

pears to have noticed the respondent, whether he was standing up or sitting down, or what his position really was. They saw no one that was injured, and heard no complaints of any one being injured. That is the extent, and the only extent, of their testimony in this respect. Moreover, at the trial there was the admitted fact that respondent was ruptured, and, if the jurors believed that this injury to his person occurred at the time of the collision, they must necessarily have believed that Dr. Hanson was mistaken when he said: "There was no jar by the collision that would throw a person out of his seat in any manner whatever."

There is no force in the fact that no one complained of being injured at the time of the collision, or on the way to Reno. It is apparent from the record that respondent was in ignorance of the actual injury, or extent of the injury, until he consulted a physician. For ought, therefore, that appears from the testimony of the witnesses present at the collision, respondent may have been just in the position in which he testifies he was, and still the testimony of the other witnesses as to their belief that no one was hurt, because no one complained of being hurt, was true. In fact, it is questionable whether any real or substantial conflict of testimony exists as to whether respondent was thrown out of his seat in the manner stated by him at the time of the collision. But, be that as it may, it must, as we think, be admitted that, at most, it only amounts to a conflict of testimony which, under repeated decisions of this and other courts, was clearly within the province of the jury to decide. When the train arrived at Reno, respondent was interviewed by Mr. Fulton, who testified as follows: "Mr. Wedekind told me that morning that there had been quite an accident at Wadsworth. I asked him if any one was hurt, and he said, 'No.' He said he thought at first that he was hurt, but had made up his mind now that he was all right. He said he was considerably frightened at first." On cross-examination he said: "Plaintiff told me on that morning that he had been pretty well shaken up." Respondent testified. "When I got off the train at Reno I saw Mr. Fulton. I told him I was hurt and badly bruised up." Taking the statement as testified to by Mr. Fulton to be correct, it does not prove, nor tend to prove, in the light of other facts, that respondent was not injured. Respondent testified: "When

I came to Reno I did not know what was the matter with me.
I felt bad—uneasy, as though I wanted to die." His conduct
sustains this testimony, for at first he went to Russack's to get
some liniment, and afterwards went to see Dr. Hogan. He
showed Mr. Russack his person, and Russack testified that "he
saw something round like a ball on the left side of his abdomen.
It was as large as a walnut." Dr. Hogan testified that when
respondent came to him for treatment he "found a rupture on
the plaintiff on the left side. It was what we term a 'direct
hernia.' I took him to a drug store, and put on a truss. He
complained of soreness all over, and particularly about the
chest, but I do not remember whether he said anything about
his arm or not * * * His complaint was mostly about the
lower part of his abdomen. There was nothing surrounding
the rupture to indicate inflammation or redness of any kind, or
anything to show that a truss had been recently worn." Dr.
Bergstein testified "that he examined plaintiff upon three dif-
ferent occasions to ascertain his physical condition. I found
that he had a double inguinal hernia. I found the one on the
left side to be the larger of the two. The one on the right
side is an incomplete hernia. On the left side the hernia is
much larger, almost amounting to a double hernia on that side,
and is in my opinion a direct hernia." This testimony is cor-
roborated by Dr. C. W. Huntington, a physician in charge of the
railroad hospital at Sacramento, who, in giving his testimony upon
this point, said: "I differ with my associates who testify here.
I say that the hernia upon the left side of the plaintiff is a
direct hernia." During the examination of Dr. Bergstein the
respondent was disrobed, and submitted, by his counsel, to the
witness and the jury, for examination as to his arm and alleged
ruptures. "The examination was had as to the flatness of the
deltoid muscle of the right arm, but the defendant's counsel
declined to examine as to the claimed injury in the abdomen,
and admitted that plaintiff was ruptured." It is unnecessary
to review or comment on the testimony bearing upon the ques-
tion whether respondent's right shoulder was dislocated at the time
of the collision, as during the trial "Mr. Lindsay stated, in open
court, that the plaintiff's shoulder was not dislocated, and that they
would not claim it before the jury."

Is it not apparent that the evidence is sufficient to justify the
conclusion that must have been reached by the jury, that the

respondent received his injuries at the time of the collision? The facts were undisputed that respondent was ruptured. There was some conflicting testimony as to the extent of the rupture—whether it was a direct hernia or not—but the fact that he was ruptured is admitted. Appellant does not contend that it was impossible for a person to be ruptured if thrown by the force of a railroad collision in the manner described by respondent. Dr. Cluness, upon his cross-examination, testified that "if a person were thrown with force against the iron top of a car-seat, striking just below the short ribs, forcing the bowels downward, as described here, it might produce rupture." Upon cross-examination, Dr. Huntington was asked this question. "If a person riding in a railroad train, sitting in his seat, were cast with much force against the top of another seat, striking upon the upper portion of his abdomen just below the ribs, would it or would it not be apt, the force being sufficient, to cause a rupture?" His answer was: "Under those superinducing causes or conditions, I should say that it might. But, with the ordinary average person, it would be very improbable, to say the least. I wish to be understood in that answer that it is a well-understood fact now that there are a large number of persons who are easily ruptured—whose congenital structure is such that they are more or less liable to a rupture by moderate causes—but with the average person I should answer your question in the negative—that he would very probably not be ruptured."

Whatever the results may have been as to the injury to respondent's arm, the entire testimony fails to convince us, as it failed to convince the jury, that he was "pretending or malingering in regard to his condition," so far as the hernia on his person is concerned. It may be, as was testified to by Dr. Cluness, that it is impossible to tell upon examination when respondent was ruptured. "He may have been ruptured," says this witness, "the day before I saw him, or twenty years before. It is impossible to tell—no man can tell by external examination;" yet the fact remains that there is no testimony tending in the slightest degree that respondent was ruptured at any other time, or from any other cause, than that stated in his testimony. True, Dr. Cluness said: "A man fifty-eight years of age, lifting and taking out different parts of a piano, and moving the piano from one part of the room to another, and occasionally lifting

the action, as plaintiff testified was his business - I can scarcely conceive of an occupation more liable to produce rupture than that." But there are innumerable causes that might produce rupture. Lifting heavy weights of any kind, and the straining liable to be produced thereby, is probably the greatest superinducing cause of rupture; but it was clearly shown, upon the trial of this cause, that it was within the range of probabilities, at least, that a person might be ruptured in the manner in which respondent testified he received the injury; and, as before stated, there is no testimony tending to show that he received this injury at any other time or manner. Respondent's conduct at the time of the collision was not that of a person simulating an injury, for the purpose of bringing an action against the railroad corporation for damages. If he had been previously ruptured, and entertained such a design, the probabilities are very great that he would, then and there, have complained to everyone, and stated just what his injuries were. Respondent, in addition to his own direct and positive testimony, introduced witnesses whose testimony tended to show that previous to the collision he was physically a sound and healthy man. Dr. Martin, medical examiner for the order of Chosen Friends, testified that he examined him in 1882, for the purpose of insurance, and that he did not to his knowledge have "a hernia or rupture. His physical condition was good." Louis Epstein testified that about two years before the trial he saw respondent naked. "He did not have any marks upon him. He seemed robust. He seems different now. He seems to be about fifteen years older than he did when I saw him last." W. L. Needham testified that he had known respondent since 1877. "I saw him walk the streets, and saw him lift pianos in my shop. He was always competent to do his work. I have noticed a difference in him in the last year. From what I have seen of him he seems to be a different man physically from what he was previously."

We have referred to or quoted and commented upon all the testimony touching directly or remotely upon respondent's right to recover. After a careful reading and consideration of the entire testimony, we are clearly of the opinion that it is sufficient to justify the action of the jury in finding a verdict in favor of respondent, and that the

contention of appellant's counsel cannot be maintained? It was argued on behalf of appellant that, even if respondent was entitled to recover, he was not, under the testimony, entitled to the amount of damages given by the jury. In actions of this kind, the plaintiff is entitled to recover such damages, if any, as naturally flow or result from, and are the immediate result of the act complained of, and the jury was so instructed. It is, of course, often difficult to exactly measure the amount of such damages. It cannot be arrived at with mathematical certainty. Some degree of latitude must always be allowed. The court, upon this point, instructed the jury that, in arriving at the amount of damages — if plaintiff is entitled to recover — "you will discard all questions of prejudice or passion for or against either party to this suit, but give such amount as in your best, honest and candid judgment, as reasonable men, you deem him entitled to, under all the circumstances. On the one hand you are not to be extravagant in that amount, and on the other hand you are not to be niggardly, but exercise your dispassionate judgment in the matter as honest men, between neighbors." In other instructions the rule of compensatory damages were clearly stated.

The testimony of the medical witnesses, introduced upon the part of appellant, was to the effect that a hernia, such as found upon the person of respondent, does not tend to shorten life, nor interfere with the pursuits of ordinary business avocations. Dr. Dawson said : " A rupture, such as the plaintiff has, does not seriously affect the transaction of ordinary business, and it does not tend to shorten life, but, on the contrary, in my judgment, would have the effect to prolong it, because it would prevent the party and restrain him from taking violent exercise, and tend to make him more cautious, and, with a well-adjusted truss, is fraught with no particular danger." It would, we apprehend, be difficult to convince a jury that a hernia, although a common affliction of mankind—the rate of men being so afflicted being stated, at the age of fifty years, as one to six—is a particular blessing, because it might be the means of prolonging a man's life. Most men, we think, would prefer to have the full vigor of their manhood preserved, even if they were thereby to be deprived of a short period of their existence. But the reason of the hernia prolonging life, as given by this witness, virtually admits that a person suffering with this affliction could not, at

all times, take the exercise necessary to conduct and carry on business in which respondent was engaged, and that he would, or at least might, to some extent be deprived of the physical strength required to earn a living. The medical witnesses for respondent expressed the opinion that a hernia "is serious to this extent: that, becoming strangulated, life is always in danger. Any injury of any kind or character which affects the vital processes of the human body naturally shortens life." Dr. Bergstein, from whose testimony the above quotation is made, also testified that "an incomplete hernia is liable at any moment to become complete; a reducible hernia to become irreducible; and either may at any time become strangulated, thus endangering life. In my opinion, a hernia of any kind has the effect of reducing, in some degree, a man's capacity to earn, and tends to shorten life." Respondent testified that he had not been able to do any work since December 22, 1887; that he had tried to work, but could not; that he had "earned three hundred dollars per month for the six years previous to the time he got hurt on defendant's cars;" and that since then he had earned nothing. Applying the principles of law as announced by the court, and to which no objections are made, to the testimony, we cannot say, as claimed by counsel for appellant, that "under no hypothesis of the evidence can a verdict of seven thousand dollars be justified."

The judgment of the district court and the order refusing a new trial are affirmed.