(77 App. Div. 102.)

### CRANE v. BENNETT.

(Supreme Court, Appellate Division, First Department. December 5, 1902.)

1. NEWSPAPER LIBEL—UNAUTHORIZED PUBLICATION—EXEMPLARY DAMAGES.

    The fact that an editor of a paper was absent at the time of the publication of certain libelous articles, and had no personal connection therewith, and had given directions to his subordinates that no article reflecting upon the reputation of any person should be published without a strict investigation as to its truth, did not prevent the recovery of exemplary damages against him.

2. SAME—MALICE—FALSITY OF ARTICLE.

    Evidence of the falsity of a libelous publication is evidence of malice, and when the defendant introduces evidence tending to show absence of actual malice therein the existence of such malice becomes a question of fact for the jury.

3. SAME—INSTRUCTIONS.

    A charge in an action for libel that took the question of personal ill will from the jury, but stated that, if the publication was false and libelous, malice might be implied as a basis for punitive damages, "and I have already laid down the rule on that branch of the case," must be considered in connection with another portion of the charge pointing out that reckless publication of libelous matter will support an award of punitive damages.

4. SAME—RECKLESS PUBLICATION.

    The reckless publication of libelous matter will support an award of punitive damages as well as one induced by personal ill will.

5. SAME—EVIDENCE—SUFFICIENCY.

    A jury was authorized to infer that the publication of a libelous article in a newspaper was reckless from the fact that the article, though containing charges of a most serious nature against a magistrate, was written up and sent in for publication by a reporter, who received all his information from a reporter of another paper, who had his information from his assistant, who claimed to have been an eyewitness of the transaction.

6. SAME.

    A jury was authorized to infer that the publication of certain libelous articles was reckless when they reiterated serious charges of a former

¶ 4. See Libel and Slander, vol. 32, Cent. Dig. § 351.

unfounded article after the receipt of a letter from the person accused therein, setting out the falsity of the charges brought against him.

**7. SAME—ADMISSIBILITY.**

Where a police magistrate was accused in a libelous article of having grossly mistreated a complainant before him, and of having insultingly refused to hold, on charges of robbery and assault, those whom she accused of such crimes, it was competent, in an action for the libel, for him to state, as a reason for not holding the persons accused under the charge preferred, that the evidence against them was not sufficient to justify such action.

**8. SAME—HARMLESS ERROR.**

There was no error where, in an action for libel, evidence apparently going to the issue of actual malice was stricken out, but was reinstated before the case was submitted to the jury.

**9. SAME—EVIDENCE—ADMISSIBILITY.**

In an action for libel, letters denouncing the first libelous article as false, written by the plaintiff to the manager of defendant's newspaper, were competent to prove actual malice in subsequent publications in the paper, reiterating the charges.

**10. SAME.**

In an action for libel, the admission of evidence competent to prove actual malice was not error, though that issue was afterwards taken from the jury.

**11. SAME.**

Where a libel for which action was brought consisted of allegations that plaintiff had said and done certain things, it was not reversible error to permit plaintiff to state what portions of the article were true and which were false.

**12. SAME.**

In an action for libel an article from another newspaper was introduced in evidence to discredit the story of one of defendant's witnesses, who had furnished to the writer of the article all the information on which it was based. The article had also been copied into defendant's paper, and constituted part of the libelous matter complained of. *Held,* that the admission was not error.

**13. EVIDENCE—COPIES—PRODUCTION OF ORIGINALS.**

It was not error to refuse to admit in evidence an entry in a book written by another than the witness, a policeman, and consisting of copies of reports made by witness to his superior officer, which had never been compared by the witness with the originals, where the originals could have been secured by subpœna.

**14. LIBEL—EXEMPLARY DAMAGES—EXCESSIVE VERDICT.**

Though the articles constituting a newspaper libel, forming the basis of an action by a police magistrate, held the plaintiff up to scorn as a hectoring, bullying magistrate, absolutely unfit for his judicial position, and though exemplary damages were justified, yet a verdict of $40,000 was so excessive as to require a reduction by plaintiff to $25,000 before it could be allowed to stand.

Ingraham and Laughlin, JJ., dissenting.

Appeal from special term, New York county.

Action by Leroy B. Crane against James G. Bennett. From a judgment in favor of plaintiff, and from an order denying a motion for a new trial, defendant appeals. Affirmed conditionally.

Argued before HATCH, PATTERSON, O'BRIEN, INGRAHAM, and LAUGHLIN, JJ.

Flamen B. Candler, for appellant.
Eugene Frayer, for respondent.

PATTERSON, J.   In an action brought to recover damages for alleged libels published concerning the plaintiff in the defendant's newspaper the jury rendered a verdict for the plaintiff in the sum of $40,000.   The defendant appeals from the judgment entered upon that verdict and from an order denying a motion for a new trial.

The plaintiff was a magistrate of the city of New York in the borough of Manhattan.   The matter of which he complains was published in four issues of the defendant's newspaper, namely, those of August 21, 22, 23, and 24, 1899.   There are four causes of action set forth in the complaint, each publication being made a separate cause of action.   They all relate to flagrant misconduct imputed to the plaintiff in the discharge of his official duty.   The article first published by the defendant and complained of by the plaintiff is the most serious.   The three subsequent articles are persistent repetitions of the matter charged in the first.   In that article it is stated that on the 20th day of August, 1899, the plaintiff was presiding in the Fifth district magistrate's court in the borough of Manhattan, and that on that day one Annie Rome made a complaint against four men of robbery and criminal assault perpetrated upon her at about 1 or 2 o'clock in the morning of Saturday, August 19, 1899.   In giving an account of the case the article was headed:

"Attack on Women from the Bench.

"Magistrate Crane Delivers Another Bitter Tirade against the Sex, and Causes Mrs. Rome to Faint.

"Declared her Story False.

"She had Accused Four Cab Drivers of Attacking and Robbing Her Near Grant's Tomb at Two in the Morning.

"Magistrate Said Any Woman Out at That Hour Deserved to be Attacked."

It then proceeds to state that the complainant, Rome, accused four cab drivers of having brutally attacked and robbed her, leaving her unconscious in the road; that a detective explained the case upon arraignment of the prisoners, and asked that they be held upon the charge of assault and robbery; that the woman declared that she had engaged a cab driver to take her to her home; that instead of driving her there the cabman she employed took her to Riverside drive and 124th street, where four men attacked and robbed her; she exhibited a finger, from which, she said, the cabman had torn her wedding ring, skinning the finger almost to the bone, and she showed how her clothing had been torn by her assailants.   The article then proceeds to state as follows:

"The magistrate listened to the woman's recital with apparent impatience, and said: 'The idea of a respectable woman being out in the streets in the morning at that hour is absurd. It's monstrous to believe the story you tell. Who would believe the tale of a woman who was drunk, and claimed that she was robbed? It's all rot, and I don't believe it, and neither does anybody else.' 'Oh, don't, your honor!' begged the woman, growing pale. 'I was not drunk, as the police know well. I am a good woman, and you do me a great injustice.' 'The woman was not intoxicated when she was brought to the station house,' declared detective Prunty. 'I will make an affidavit to that effect.' 'I don't want your affidavit,' replied the magistrate. 'No good woman ought to be out in the street at that time, and if she was attacked at that hour she deserved it. She could not expect anything better. I will not enter-

tain the complaint of assault and robbery, because, in the first place, I don't believe it, and, in the second, the woman could not hope to receive more consideration from men at that hour.' 'Oh, don't, don't! For God's sake, don't! I am respectable!' cried the humiliated and mortified woman, as she fell to the floor in a faint. The magistrate stopped long enough in his bitter tirade to instruct the attendants to pick up the woman and carry her to a bench near by, where, after some minutes, she was revived." "Indignation at the magistrate's remarks was perceptible among the spectators and court attendants. The stern face of the magistrate showed neither sympathy for the woman nor regret at his ungracious words. He ordered the clerk to change the complaint to one of disorderly conduct against John McDermott and John Lacy, two of the cabmen, and held them in three hundred dollars bonds each to keep the peace for three months. Crowley and Martin Mulady, the others, were discharged." "The police yesterday were bitter in their criticism of the magistrate's course."

The three other articles are, as stated before, reiterations of the charges made against the plaintiff, and in some respects they amplify them. They not only reassert, but make the effort to substantiate, the original charge. They also refer to alleged misconduct of the plaintiff in other cases that had been before him. In the second article published it is stated that it was "not the first time that Magistrate Crane has figured in peculiar decisions"; that "on the same Sunday morning he declined to issue a warrant asked for by Edward J. Murphy, an agent of the Society for the Prevention of Cruelty to Children, the agent having with him a child whose left ear was torn and whose face and body were covered with bruises"; that several months ago the plaintiff was accused of saying from the bench that nine women out of every ten were liars, but when he saw that in print the next day he denied the declaration. Other matters of misconduct of the plaintiff are referred to in this article, but they do not require special consideration now. In the third article it was said that the district attorney would give the grand jury a chance to investigate the ruling of the magistrate who had freed alleged robbers, and that the "police stick to the statement of the tirade in court and the ignoring of evidence."

It is unnecessary to state in detail the contents of all the different articles. Enough has been referred to, or quoted, to show that what was published of and concerning the plaintiff, if false, tended to degrade him in the public estimation, and to hold him up to the contempt and scorn of the community as a hectoring, bullying, insulting magistrate, who refused to give heed to a complainant who appeared before him making accusations of the gravest character against persons whom she charged with the commission of outrageous crimes. If the contents of the articles published in the defendant's newspaper were true, it is evident that the plaintiff was absolutely unfit to fill the judicial position he occupied.

The defendant, in his answer, undertook to justify the publications made and to set up the truth in justification. On the trial evidence was given as to what took place in the magistrate's court on the 20th of August. That evidence was to some extent conflicting, but the jury found that the account given in the defendant's newspaper of the conduct of the plaintiff on that occasion was false.

We do not understand the learned counsel for the defendant as

claiming that if, upon the whole evidence, the jury were authorized to make that finding, the plaintiff was not entitled to a verdict; but his contention is that under the proven facts of the case, and under the law as it is settled in this state, the plaintiff was not entitled to recover exemplary damages. That contention is founded, in the first place, upon the fact that the defendant had no personal connection with the publication of the libelous articles, and did not in any way personally participate in the preparation or circulation of' them. When they appeared in his newspaper he was absent from the United States. Before going abroad he left with the editors, subeditors, and others engaged upon his newspapers a notice that it was an imperative rule of his office that nothing reflecting upon the reputation of any person or corporation should be published in either of his newspapers until, after strict investigation, the truth of the same had been ascertained. It is strenuously urged that this proof, which was introduced in support of allegations in the answer in mitigation of damages, was such as to prevent an award of vindictive damages. We have heretofore decided that it was not in cases where the same notice given by the proprietor of the newspaper was disregarded by those conducting it for him in his absence. McMahon v. Bennett, 31 App. Div. 16, 52 N. Y. Supp. 390; Morgan v. Same, 44 App. Div. 323, 60 N. Y. Supp. 619; O'Brien v. Same, 59 App. Div. 623, 69 N. Y. Supp. 298. We see no reason for holding otherwise in this case, notwithstanding the elaborate argument of the learned counsel for the appellant. There is nothing in the recent case of Craven v. Bloomingdale, 171 N. Y. 439,'64 N. E. 169, which sustains a contrary view. There the subject of punitive damages was under consideration in an action brought against a master for the act of his servant in causing an alleged arrest of the plaintiff in that action, and it was held that the charge of the trial judge instructing the jury that they had power, if they saw proper, to award such damages, without instructing them that they could not be awarded unless there was proof that the acts of the servant were malicious; that the master was implicated with the servant therein, or had, either expressly or impliedly, authorized or ratified them,— was erroneous. Here, however, is the case of a proprietor of a great metropolitan journal leaving it in his absence in the control of a general manager, of editors, of subeditors, and a staff of reporters. The authority is confided to them to carry on the general business of editing, publishing, and circulating that newspaper. As was said by Spencer, J., in Andres v. Wells, 7 Johns. 261, 5 Am. Dec. 267, where a man is the owner of a paper, and gives over conducting it to another, he thereby constitutes him his general agent, and is answerable for all his acts done in the execution of that trust, whether within or beyond the intention of the principal.

The notice the defendant gave to his employés cannot be construed as a limitation of authority, such as would absolve him from liability from the consequences flowing from their failure to conform their conduct to its requirements. It was intended for their guidance and direction and was a warning to them. Their acts in dis-

regard of that warning must, in legal effect, be considered as if they were his own.

But the question of punitive damages is presented by the learned counsel for the appellant in another aspect. It is claimed that the trial judge committed error and misled the jury as to the degree of malice that would authorize an award of punitive damages. The court charged as follows:

"It is the law of this state that a libel recklessly or carelessly published, as well as one induced by personal ill will, will support an award of punitive damages. The plaintiff in an action of libel gives evidence of malice whenever he proves the falsity of the libel. I may here add that the basis of punitive or exemplary damages is the alleged malice, and unless you reach the conclusion that there is malice there can be no award of exemplary damages. There can only be a recovery for actual damages, namely, damages to the feelings and to the reputation of the plaintiff."

The court then further instructed the jury in these words:

"A plaintiff in an action of libel gives evidence of malice whenever he proves the falsity of the libel. It becomes then a question for the jury whether the malice is of such a character as to call for exemplary or punitive damages, and that question is not to be taken away from the jury because the defendant gives evidence which tends to show that there was in fact no actual malice, but, when he gives evidence tending to prove the absence of actual malice, then it is the duty of the judge to submit to the jury the question, as one of fact, whether such malice existed in the publication."

That language is almost literally quoted from the dissenting opinion of Davis, P. J., in Samuels v. Association, 9 Hun, 288, which dissenting opinion was adopted by the court of appeals (75 N. Y. 604) as its own, and states a rule which has ever since been regarded as settling the law in this state on that subject. But the learned judge also expressly charged the jury that there was no evidence in this case of ill will on the part of the defendant or any of its employés; that is, any personal ill will. He said:

"When that [ill will] is established in respect of a defendant, it is evidence of actual personal malice, and will afford a basis of an award for exemplary damages. That is not this case. If, however, this publication is false and untrue,—libelous in its character,—then malice may be implied, and we have, instead of malice which grows out of ill will, hatred, or ill feeling, what is known as malice in law, or implied malice, and when that is established then there is a foundation for exemplary or punitive damages, under the law of this state, and I have already laid down the rule on that subject and on that branch of the case."

Referring to other portions of the charge to ascertain what the rule laid down in that connection was, we find that the court stated that "it is the law of this state that a libel recklessly or carelessly published, as well as one induced by personal ill will, will support an award of punitive damages."

The charge must be considered as an entirety, and when we read what was said respecting punitive damages from implied malice we must consider it in connection with the statement in the charge that a libel recklessly or carelessly published would entitle the plaintiff to punitive damages, as well as where the libel was inspired by personal malignity. The recovery of punitive damages in an action for libel is not restricted to cases of actual malice, but may be given for

a libel recklessly or carelessly published, as well as one induced by personal ill will. Smith v. Matthews, 152 N. Y. 152, 46 N. E. 164. Here the trial judge stated that this was not a case of actual malice on the part of the defendant, and, in effect, that it was only by reason of implied malice from a reckless and careless publication of the libel that the defendant could be held liable for punitive damages; and such an instruction as that was approved also in Smith v. Matthews, supra. We find nothing in Krug v. Pitass, 162 N. Y. 154, 56 N. E. 526, 76 Am. St. Rep. 317, or the other cases cited by the appellant, in conflict with that view.

That the first of the libelous articles in this case was recklessly published the jury were authorized to believe from the evidence relating to the origin of that article, which was prepared by McQuade, a reporter, who had no personal knowledge of the occurrence of which he wrote, who received the information at secondhand, and who, fully appreciating the serious character of the charges he made, failed to make proper verification of his statement before the article was sent to the defendant's paper for publication, and who had no actual ground for believing the statements of his article to be true before he sent it in. The other articles were published after the plaintiff had protested against the first article, and had declared in a letter written to the general manager of the defendant's newspaper that the contents of that article were false.

We have examined the various exceptions of the defendant, one of which relates to the plaintiff's being allowed to testify that the evidence submitted to him as a police magistrate when the four men were arraigned before him on the charges of robbery and assault was insufficient to hold them. That was merely a statement by the plaintiff of the reason for not holding the accused persons upon the specific charges Mrs. Rome made against them. It is also urged that the court was in error in striking out parts of the testimony of the witness McQuade, who wrote the first article published in the defendant's paper. McQuade, who received his information from one Lindley, who was a reporter of another newspaper, testified, in effect, that Lindley had informed him that his (Lindley's) assistant, Lynch, was present during the proceedings before the plaintiff on the 20th of August; that Lynch made a written statement of what occurred at that time, and placed it on Lindley's desk. McQuade wrote the article from the information he received from Lindley, and, not having heard from Lindley anything further concerning the matter, he sent the article to the night editor of the defendant's newspaper. McQuade also testified further and in detail as to what took place between himself and Lynch on the day of the publication of the article, and to a full conversation he had with Lynch upon the subject of that article, and all of the testimony relating to that conversation was stricken out. It seems to have relation to the question of actual malice in the publication, but what was so stricken out was reinstated by the court, and was before the jury when the cause was submitted to them.

Exceptions were also taken to the admission of letters written by the plaintiff to the manager of the defendant's newspaper, in which

he denounced the articles of which he complained as being false, and demanding an apology from the publishers of the newspaper. These letters were undoubtedly offered as indicating actual malice in the publications subsequently made. They were competent upon that subject, although the case did not, as it went to the jury, turn upon that question; the judge specifically instructing the jury that actual malice, consisting of personal ill will or malignity, was not in the case. Nor do we think it was error to allow the plaintiff to state what parts of the article published in the issue of August 23, 1899, were true and what untrue. The witness was not called upon to express an opinion, but to state facts, which he did in his answer, admitting the truth of some of the statements in the article, and specifically pointing out other statements which he swore were false. This method of examination may be of doubtful propriety, but we do not think such an error was committed as requires a reversal of the judgment on that ground. Nor do we think it was error to admit in evidence the copies of the defendant's newspaper of July 26, 1899, and August 22, 1899. They were admissible upon the point of actual malice, which the plaintiff undertook to establish, but which, as before stated, was eliminated from the case in the judge's charge.

An exception was taken to a ruling of the court admitting in evidence an article published in the New York World of August 21, 1899, commenting on the conduct of the plaintiff in connection with the inquiry into the Rome charges on the preceding day. That article was introduced on the cross-examination of Shober, a reporter for the World, called as a witness for the defendant. He did not write the article, but gave the information from which it was written. The writer "got his facts wholly" from the witness. The article was used "for the purpose of affecting the story which this witness had given" on his examination in chief. But the whole of this World article was printed in the defendant's newspaper in its issue of August 23d, and is a part of the defamatory matter constituting the third cause of action set forth in the complaint. It was not error to receive it in evidence.

It was not error to reject as evidence the entry in the book referred to by Acting Police Captain Norton on his examination as a witness for the defendant. That book contained only copies of reports made by the witness to his superior officers. He never compared it with the original report. It was not in his handwriting, but was written by Officer Murphy. The original was accessible, and its production could have been compelled by subpœna. None of the other exceptions to the rejection or admission of evidence requires special consideration.

Notwithstanding the character of these libels, which were so grave as to entitle the plaintiff to exemplary damages, we cannot escape the conclusion that the amount awarded by the jury was altogether excessive, and that even as punishment that amount transcends all reasonableness and propriety. It is very true that damages are within the discretion of the jury; but, even where they are awarded for punishment, their very exorbitancy may show that in fixing the quantum the jury were actuated by passion. Section 999 of the Code

of Civil Procedure, which admits the granting of a new trial for excessive damages, announces a rule apparently of general application. In Fry v. Bennett, 9 Abb. Prac. 45, which was an action of libel in which exemplary damages were awarded, it was said that the court would not interfere with the verdict of the jury unless such damages were so outrageous as to strike every one with the enormity and injustice of them, so as to induce the court to believe that the jury must have acted from prejudice, partiality, or corruption, as was held in Coleman v. Southwick, 9 Johns. 51, 6 Am. Dec. 253.

Here, as before remarked, we think the jury must have been influenced by passion or prejudice in rendering this enormous verdict, and we are of the opinion that a new trial should be granted, unless the plaintiff stipulates to reduce the recovery to the sum of $25,000.

The order denying the motion for a new trial and the judgment must be reversed, with costs, unless the plaintiff stipulates as above suggested. If that stipulation is given, the judgment and order will be affirmed, without costs to either party of this appeal. All concur, except INGRAHAM and LAUGHLIN, JJ., dissenting.

---

(77 App. Div. 338.)

HUNT v. PROVIDENT SAV. LIFE ASSUR. SOC. OF NEW YORK.

(Supreme Court, Appellate Division, First Department. December 5, 1902.)

1. TRUSTEE—REFORMING LIFE POLICY.
   One who insures his life stands in the relation of trustee of an express trust to the assignee of the interest of the beneficiaries, within Code Civ. Proc. § 449, so that he may maintain action to reform the policy as to premiums to be paid.

2. LIFE POLICY—ACTION TO REFORM—DEATH OF PLAINTIFF—SUBSTITUTION.
   On the death of insured after commencement of action by him to reform the policy as to premiums to be paid and to recover the surrender value of the policy for breach of contract by the insurer, the assignee of the interest of the beneficiaries may be substituted as plaintiff, under Code Civ. Proc. § 757, so far as he is merely the successor to the cause of action set up in the original complaint, and under section 756 as assignee of the entire claim.

3. SAME—SUPPLEMENTAL COMPLAINT—CHANGING CAUSE OF ACTION.
   The insured dying pending action by him to reform the policy on his life as to premiums to be paid, and the assignee of the beneficiaries' interest being substituted as plaintiff, he may, under Code Civ. Proc. § 544, file a supplemental complaint asking for the reformation and a recovery of the full amount secured by the terms of the policy, this not setting up a new cause of action, or changing the character of the relief demanded, except in degree.
   Van Brunt, P. J., dissenting.

Appeal from special term, New York county.

Action by William Wilkinson against the Provident Savings Life Assurance Company of New York. On death of said plaintiff, John E. Hunt moved to continue the action in his name, and for leave to serve a supplemental complaint. From the part of an order granting the first part of the motion defendant appeals, and from the part of the order denying leave to serve the supplemental complaint Hunt appeals. Reversed on Hunt's appeal.