## J. WAYNE GATTSHALL, Appellant *v.* WILLIAM SIZEMORE, Respondent.

No. 3835

March 29, 1955.                    281 P.2d 400.

*Drendel & Dixon* and *Charles E. Springer,* all of Reno, for Appellant.

*Diehl & Recanzone,* of Fallon, for Respondent.

## O P I N I O N

By the Court, BADT, J.:

This is an appeal from a judgment for plaintiff for damages for defendant's malicious prosecution of him

on a charge of burglary. The main question presented is whether the evidence supports the trial court's finding of lack of probable cause and its inference of malice.

On Gattshall's criminal complaint Sizemore was arrested on a warrant charging him with first degree burglary of Gattshall's premises near Fallon, Churchill County, Nevada, and stealing therefrom a saddle and other personal property. At the preliminary hearing Sizemore was dismissed. Thereafter he commenced his action against Gattshall in the district court for damages for Gattshall's alleged malicious prosecution, and recovered a judgment of $417. This sum included items of expense of transportation from his camp in Berniece Canyon to the justice's court, the loss of six days' mining operations of a profitable antimony property, expense of board and room while attending the preliminary hearing, and sundry other trial expense, all totaling $416. To this the learned district judge added the sum of $1 for that Sizemore was filched of his good name and made poor indeed. Gattshall feels aggrieved at being ordered to pay these sums—not indeed because of Sizemore's vindication but because of Gattshall's lack of malice in the prosecution—because, in short, Sizemore had not proved lack of probable cause for his accusation. Out of this accusation an involved and dramatic sequence of events developed.

In February, 1952, a utility room on Gattshall's premises near Fallon was burglarized, and property stolen therefrom included Gattshall's valuable saddle. Late in 1953 Gattshall received word through a friend, Willie Harrison, that a saddle of similar description had been seen in Austin, Nevada, the preceding summer. Gattshall went to Austin and asked the sheriff to investigate. The sheriff did so and, in a letter, communicated the results to Gattshall. This was to the effect that the ranch owner contacted by the sheriff had seen the saddle in the possession of an employee, who was later identified as Max Aldrid. In a second letter the sheriff gave his version of what happened—that Aldrid had got the saddle on a

trade from Sizemore; that in trade for the saddle Aldrid traded to Sizemore a horse belonging to Marvin Gandolfo. Now this at first blush would appear to indicate a rather highhanded dealing with other people's property. But so far no one had verified a single one of the essential facts. Gandolfo's horse never again came into the picture. Neither did Gandolfo. Aldrid, it is true, had *a* saddle. And here is the description furnished by Willie Harrison that satisfied Gattshall that the Aldrid saddle was the Gattshall saddle. The quotation is from Gatshall's testimony: "Exceptionally well made saddle, out of extra good leather, custom made saddle, * * * type of leather * * * type of skirts and rigging."

We may be pardoned for dwelling on this description, for it was what satisfied Gattshall that the saddle was his. Unless this Aldrid saddle, obtained in a trade from Sizemore, was the Gattshall saddle, any suspicion of Sizemore's connection with the burglary was entirely without any basis or foundation of any kind whatsoever. So we take first and discard as of no identifying value the fact that it was made of extra good leather. Thousands of saddles are so made. We next take and likewise discard the fact that the saddle was exceptionally well made. Thousands will meet that description. We examine next the fact that it was a custom-made saddle. Now the learned district judge, like most of us of the bar and bench of Nevada, was a product of the cow country. He undoubtedly knew that in times past it was the ambition of every $40 a month cowpuncher to own a custom-made saddle, for which he was willing to pay a month's wages, and that if cowpunchers are now getting $200 a month, the $40 saddle of earlier days probably costs $200; that the mere fact that a saddle is custom made is not an identification; that if the fact that it was custom made had any significance it was in the fact that a custom-made saddle might well bear the owner's initials tooled in the leather of the cantle. An example of this lies in the fact that the Aldrid saddle, traced to the

original ownership of J. Elmer Williams, had the initials J.E.W. on the cantle. And the district judge undoubtedly knew that a custom-made saddle invariably bears the stamp of the maker—by no means identification of an individual saddle, but certainly limiting the field; that Visalia Stock Saddle Co., D. E. Walker, G. S. Garcia, J. M. Capriola and others are bynames for custom-made saddles in Nevada and throughout a large part of the West. But it appears that Willie Harrison also described the type of skirts and rigging. Now both of these items are of importance to one having his saddle custom made. Like Hebrew scholars arguing for hours over the meaning of a sentence of the Talmud, a pair of western cowmen will hold forth on the merits and demerits of a square-skirted saddle and a round-skirted saddle, respectively. The end result, as probably catalogued by the learned district judge, is that there are about as many square-skirted saddles as round-skirted saddles. That the skirts would supply a distinction is undoubtedly true. One seeking a square-skirted saddle would know that a round-skirted saddle discovered in his search would not be the saddle sought. And vice versa. But that a certain saddle was the one sought by him because, forsooth, it had round skirts, as did his, is no more convincing than that a cow was his because it was brockle-faced or because it was red. That the "rigging" was described is likewise without value as an identification. As the district judge probably knew, in the range country of Nevada a saddle is "single rigged" if it is equipped with one cinch and "double rigged" if it is equipped with two cinches. Styles change and preferences change and double-rigged saddles come and go. Like the shape of the skirts, the merits and demerits of single-rigged and double-rigged saddles are the subject of much argument.[1] Even if one credits Willie Harri-

---

[1]Spanish custom undoubtedly largely influenced the use of the single-rig saddle which found its prevalence in California and Nevada, resulting in the almost universal manufacture in those

son's description of the rigging to have been more technical—to have fixed the location of the single rig as either "three-quarter" or "center-fire," the most we have is limitation to a class and not identification of an individual. We do not even know what Willie Harrison said about the rigging. And though Willie Harrison described the leather as "extra good," he made no mention of the design stamped thereon—whether it was the familiar flower design, or basket design, or plain with only a border design. We emphasize these matters in view of the fact that Gattshall was repeatedly asked for the

states of the single-rig D. E. Walker (Visalia) saddle. That influence was not so much felt in Colorado or Wyoming or even in New Mexico, Arizona and Texas where we consequently find the double-rig saddle more popular. Nor is the Spanish influence, or the lack of Spanish influence, as the case may be, restricted to the type of saddle. The same prevalence of the Spanish influence and of the Spanish vaqueros finds a prevailing use in California and Nevada of the long braided rawhide rope, the riata, or more properly reata, or lariat (la reata, the rope). This was a rope of great length, some 65 feet, which the vaqueros used with a large running noose playing through a heavy rawhide honda, often lined with metal, giving the noose weight and balance for the throw. Cowboys in the western states more free of the Spanish influence are found using a shorter sisal or Manila rope tied hard and fast to the horn and thrown for the most part with a smaller noose. The use of the long rawhide riata permitted the vaquero (buckaroo) to use his rope as long or as short as desired. Instead of being tied hard and fast to the horn, after the noose was thrown over the head or horns or around the forefeet or hind feet of the cow or horse, it was held fast by taking several turns around the horn. The cowboy expressed it as "taking his dallies." The Spanish influence further resulted in the widespread use in Nevada and California of the Spanish bit or spade bit, as contrasted with the prevailing use in the other western states of the curb bit or "grazer." Bancroft found the California horseman and his trappings superior to the Mexican as well as the Chilean and Peruvian, and, as to the saddle, he found "the girth exactly in the center, and stirrups forward, almost an appendage from the pommel." XXXIV Bancroft, California Pastoral, 447 (1888). Hittell describes at length the Californian saddle, its tree, its skirts, stirrups, tapaderos, its cinch, the latigo straps, though, strangely, he does not refer to the tapaderos or latigos by those names—the spade bit, the reata or lasso and the skill of the Californians in using it. 2 Hittell, History of California 489 (1885). The use of chaparajos (chaparejos, chaparreras, chaps), of the large roweled spurs, the silver conchas, and other trappings and accessories of the vaquero may be likewise traced.

"description" given him by Harrison, to "go in detail and describe it," to tell if there were "any distinguishing characteristics." The district judge heard these questions and the entirely unsatisfying answers. But Willie Harrison apparently knew Gattshall's saddle. He knew that it was a custom-made saddle. And if it was a custom-made saddle it might well have had one sure identification—the initials of the owner tooled in the leather on the cantle.[2] And if he had looked, he would have found there not J.W.G. but J.E.W. At least this is the uncontradicted testimony of Sizemore and Yost.

In any event, relying only on the two letters from the sheriff and Willie Harrison's so-called identification, without contacting Sizemore or Aldrid, without further attempt to locate or see the Aldrid saddle, Gattshall put his facts before the district attorney of Churchill County, who suggested that Gattshall "bring these two men together," which Gattshall says he took to mean to sue out a warrant for their arrest. At the trial of the main action the district attorney, as a witness, was asked, "Did you advise Mr. Gattshall to file a complaint," and he replied, "No, I did not." Gattshall then went to the justice of the peace for the purpose of obtaining a warrant. The justice of the peace testified that Gattshall first obtained the issuance of a search warrant, further details of which were not described. He testified further: "After that had been issued he came back to the office and demanded that I issue a warrant of arrest and at that time why he told me what he thought was the basis of issuing the warrant and the complaint and I told him that in my opinion he had no basis for the issuing of the

---

[2] These comments are not appreciably weakened even if we frankly grant that a custom-made saddle might indeed be bare of initials and that a factory-made saddle might subsequently be initialed. Nor are they weakened by recognition of the fact that a cowman could pick out his own saddle from a hundred or more. A barbed wire scratch, a spur track, identifiable saddle strings and many other details might serve to identify it. None such is disclosed by the record. And such details, if they existed and were reported would have indicated that the saddle Willie Harrison saw was not the Gattshall saddle.

warrant. He demanded that it be issued and I issued it." He testified further as to the preliminary hearing: that Gattshall had testified simply to the fact that he thought Sizemore had been in Fallon about the time of the burglary; that no other witnesses testified and that the justice of the peace dismissed the case. On cross examination he testified that Gattshall showed no personal enmity of any kind towards Sizemore but merely a desire to pursue whoever had burglarized his place. Gattshall, in defense of the main action testified that in filing the criminal complaint his only intention or motive "was to bring them to justice; to recover my property"; that the only feeling he had towards Sizemore was the suspicion that Sizemore had stolen some of his property. He called one witness who testified that Sizemore's reputation was more or less questionable, and another witness who testified: "Well [Sizemore's] reputation ain't very good amongst the rest of the people but that is their personal opinion." Gattshall testified that Sizemore's reputation in the community for honesty and integrity was bad.

As to the actual saddle in the possession of Aldrid, Sizemore testified definitely that he, Sizemore, had bought it from one Albert E. Yost and later sold it to Aldrid. Yost in turn testified that he had sold the saddle to Sizemore and that he, Yost, had bought it from Chet Lima, who in turn had bought it from J. Elmer Williams, whose initials, J.E.W., were stamped on the cantle. There was no contradiction of any of this testimony, nor is there any suggestion that these facts could not have been obtained with a reasonable amount of diligence either by Sizemore or by the sheriff. The trial court was left with the fact that the saddle traded or sold by Sizemore to Aldrid was not the saddle taken in the burglary of the Gattshall premises.

At the conclusion of the trial, after hearing argument of counsel, the court orally announced its decision from the bench to the effect that the prosecution had been

had without probable cause and that malice was inferred. Appellant's main assignments of error are that plaintiff failed to sustain the burden of proving either lack of probable cause or malice. In support of this contention appellant relies on Richter v. Neilson, 11 Cal.App.2d 503, 54 P.2d 54, 58. Not only are the facts of that case so different as to afford it no value as authority in the present appeal, but it is distinguished by its reliance upon the rule "that where one, before instituting the prosecution, has in good faith consulted an attorney at law in good standing, particularly if such attorney be one charged with the prosecution of public offenses, and has stated to him all the facts of the case, and has been thereupon advised by such attorney that a prosecution will lie, and such person has acted honestly on that advice, this of itself constitutes probable cause." The court elsewhere stresses the fact that the defendant acted under the advice of the deputy district attorney in filing the complaint. It is true that the court stated that "whether or not a want of probable cause is shown, malice must be affirmatively established. * * * In other words, there must be concurrence of malice and want of probable cause." There follow some confusing statements as to the court's position on whether, in a proper case, malice might be inferred from a lack of probable cause. Be that as it may, we may note that in McNamee v. Nesbitt, 24 Nev. 400, 56 P. 37, this court held that malice might be presumed from want of probable cause. It also held that whether the defendant acted in good faith on the advice of counsel, if given, was a question of fact. In Cassinelli v. Cassinelli, 24 Nev. 182, 51 P. 252, this court again stated that malice might be inferred from want of probable cause. In the instant case the inference finds justification not only in the rather extreme lack of probable cause but in the fact that the district attorney refused to advise the prosecution and the justice of the peace decidedly advised against it.

Gattshall, called by the plaintiff as an adverse witness,

testified to his receipt of two letters from the deputy sheriff of Lander County reporting on what he had discovered concerning the subject matter. The witness was permitted to testify in detail as to the contents of these letters. Later, in testifying on his own behalf in defense, Gattshall sought to introduce these letters in evidence. An objection was sustained on the ground of hearsay despite the insistence of appellant that the introduction of the letters was not sought to prove any of the facts therein contained, but simply to show the facts on which Gattshall relied in filing the criminal complaint, and to prove that such complaint was not filed without probable cause. Appellant assigns the rejection of these letters as error. Assuming for the sake of argument that the letters should have been admitted, the error, if any, was not prejudicial. Gattshall was permitted to testify to the complete content of both letters. Neither letter contained a word of description of the Aldrid saddle. Other rulings on the admissibility of evidence are assigned as error but we find them without merit.

Our conclusion is that there was ample evidence to support the court's finding of lack of probable cause and its inference of malice.

The judgment is affirmed with costs.

MERRILL, C. J., and EATHER, J., concur.