RUSSELL F. MILLER, APPELLANT, v.
RETA SCHNITZER, RESPONDENT.

No. 4454

May 29, 1962                                    371 P.2d 824

*Harry E. Claiborne,* of Las Vegas, for Appellant.

*Morton Galane,* of Las Vegas, for Respondent.

## OPINION

By the Court, THOMPSON, J.:

Reta Schnitzer commenced an action against Dr. Russell F. Miller to recover damages, averring that he had maliciously and without probable cause charged her with the crime of embezzlement, caused her arrest, confinement in jail, and subsequent appearance at a preliminary hearing to defend herself, at which hearing she was exonerated. The jury returned a verdict for her and awarded $15,000 as special damages, $30,000 as general damages, and $50,000 as punitive damages. Judgment was entered accordingly. The defendant's motion for new trial was denied. He appeals. The main question presented is whether the judgment totaling $95,000 is excessive under the evidence presented.

1. *The evidence.* The record on appeal presents a mass of evidence, both oral and documentary. There appears to be a substantial conflict as to most, if not all, of the material issues involved. The jury evidently chose to accept the evidence favoring the plaintiff's cause. Therefore, in briefly stating the case, we shall refer only to the evidence relied upon by the plaintiff to support the judgment.

Reta, a divorcee, lived in Las Vegas with her eight year old daughter. In 1954 she obtained employment with an architectural firm, subsequently becoming its office manager, which position she held when she met Russell in May 1957. She saw him from time to time thereafter, but it was not until the end of 1958, after Russell had obtained a divorce, that steady dating occurred. By April 1959 a daily companionship had come about and there was discussion of marriage. His apartment was but a block or two from hers, and it was not

an inconvenience to live together as man and wife a good part of the time, which they did. The marriage ceremony did not take place because Reta's parents were planning a visit in 1960, and all wished to have them witness the event. Furthermore, Russell had not yet established a favorable rapport with the daughter. They exchanged keys to each other's apartment. The doctor kept a reasonable clothing supply at each "home." He gave Reta "housekeeping money" when he started spending most of his time at her apartment, which she used for food, cleaning, liquor, etc. That money was kept in a little box and was considered (by her, at least) to be their joint money. The little box usually contained $400 or $500, but at the time of their quarrel, to be later mentioned, contained $180.

During these happy times the doctor wished to deposit in a safe place a tidy sum which he had saved to pay "back taxes." Reta told him about a vault at her employer's place of business, whereupon 150 one hundred dollar bills were put in manila envelopes, sealed and placed in the vault.

In July 1959, only about two months after they had established the relationship just described, an event occurred causing its abrupt termination. At four a. m. the doctor's answering service called at Reta's apartment. Upon being informed that the doctor was not there, Reta was asked to go to the doctor's apartment because it was an emergency and the doctor's phone at his apartment had been busy. Reta obliged. Upon entering she noticed female clothing strewn around the front room and, when she peeked into the bedroom, another form was in bed with the doctor. Having been sincere in her marital intentions, she found this breach of trust on the doctor's part to be unforgivable, and told him that they "were through."

Two or three days later Reta removed the manila envelopes from the vault. She wanted to "worry him about the money." When the doctor demanded its return, a dispute developed over the total amount that had been put in the envelopes. Because of that dispute, Reta

thought it wise for an attorney to arrange for the opening of the envelopes and return of the money. This was done. The president of a bank related that Reta had brought the envelopes to his bank, where they were opened and found to contain 150 one hundred dollar bills. Reta thereupon purchased a $15,000 cashier's check payable to Dr. Russell F. Miller. The doctor received delivery on that check on July 23, 1959. Notwithstanding, the doctor on August 4, 1959 swore to a criminal complaint charging Reta with the crime of embezzlement, asserting that Reta, as a bailee of sums in excess of $100, unlawfully appropriated and used the moneys for "purposes other than that for which the same were entrusted, with the intent to defraud the owner thereof." The complaint was filed with the justice of the peace, and warrant of arrest issued before the police department had completed its investigation. The complaint was prepared at the request of Dr. Miller and not at the request of the police department.

Reta was arrested at her place of employment. Coemployees witnessed the event. She was taken to the police department, booked, photographed, fingerprinted, undressed and examined by the matron, and thereafter placed in a cell with other prisoners, one of whom asked, "What are you in for this time?" She remained in jail for approximately one hour before bail was arranged. The Las Vegas Review Journal, circulation 27,000, and the Las Vegas Sun, circulation 19,000, daily newspapers, each had carried a news story, relating a version of the embezzlement charge. After a preliminary hearing, the justice of the peace dismissed the case.

As office manager of the architectural firm, Reta was paid a yearly salary of $8,402.45. Primarily because of the publicity given the case, Reta's employment was terminated September 10, 1959. She remained in Las Vegas for two or three weeks and, though she did not personally seek other employment, friends inquired for her and were informed that her services were not desired. She became nervous and irritable, could not sleep, and received medical attention. School children were making life miserable for her daughter. Reta determined that

she could no longer make a life for herself and daughter in Las Vegas, and moved to southern California. On October 5, 1959 she obtained work with H. L. Yo Company. This job lasted until October 25, 1959 when her resignation was requested because the one in charge had learned of the Las Vegas felony accusation. She thereafter sought employment at various places requiring a security clearance, but to no avail. In January 1960 she obtained work at Tops Records, as an executive secretary, where she remained for six months. She was paid $500 a month. She voluntarily resigned, to accept a similar position with Information Systems, Inc., at $6,000 a year, which position she held at time of trial.

Evidence designed to establish Dr. Miller's wealth was received. It discloses that his net worth, according to a financial statement given a bank in April 1959, was about $51,000; that his "statement of income" in 1957 was $40,647.21 gross and $15,466.07 net, and in 1958, $66,304.92 gross and $28,703.49 net. He was the principal stockholder and president of Miller Enterprises, Inc., conducted an active medical practice, a drive-in restaurant and a Tastee-Freeze business. As one of a group of medical men, he owned a one-ninth interest in three corporations: COS Incorporated, which owned the building and improvements of a medical arts center; LPX Incorporated, which conducted a laboratory business in that center; and Paradise Pharmacy Incorporated, which carried on a pharmaceutical business.

2. *The problem of damages.* Compensatory damages consisting of $15,000 special damages and $30,000 general damages were awarded Reta. The amount given for special damages is not fully supported by the record. The damages claimed by the complaint as special in nature were (a) the attorney's fee paid in defense of the criminal charge; (b) lost earnings; (c) cost of medical care; and (d) impaired earning capacity for three years. The total amount requested was given. No evidence was offered as to the cost of her medical care. Nor does the record establish that there has been an impairment of her ability or capacity to perform the work for

which she is trained and qualified. Her claim is not for a physical injury diminishing her ability to perform. Cf. Sierra Pacific Power Co. v. Anderson, 77 Nev. 68, 358 P.2d 892. Rather it is essentially for a damaged reputation presently resulting in a lower annual income than previously enjoyed. Damage to reputation, among other things, is an item of general damage and presumably was included in the $30,000 general compensatory damage award.

The record does support an award of special compensatory damages in the following particulars: (a) $3,000 attorney's fee paid in defense of the criminal charge; (b) $2,800 earnings loss while out of work from September 10, 1959 to some time in January 1960 (except for two weeks' employment during October 1959); (c) $2,200 earnings loss by reason of reduced salary from January 1960 to trial in December 1960, all resulting in a total proven dollars and cents loss of $8,000.

We turn to consider the general compensatory damage award of $30,000. In a malicious prosecution case, the plaintiff may recover general money damages to compensate for injury to reputation (in the instant case Reta's reputation for truth), humiliation, embarrassment, mental suffering and inconvenience, provided they are shown to have resulted as the proximate consequence of the defendant's act. These elements of damage are wholly subjective. The monetary extent of damage cannot be calculated by reference to an objective standard. The extent of such damage, by its very nature, falls peculiarly within the province of the trier of fact, in this case, a jury. Brownfield v. Woolworth, 69 Nev. 294, 248 P.2d 1078, 251 P.2d 589; Burch v. Southern P. Co., 32 Nev. 75, 104 P. 225; Taylor v. Nevada C. O. Ry., 26 Nev. 415, 69 P. 858; Solen v. Virginia & T. R. R. Co., 13 Nev. 106. The only limitation upon the judgment of the jury in this regard is that the damages thus awarded must not have been given under the influence of passion or prejudice. NRCP 59(a)(6). If it appears that they were so given, the award will be deemed excessive. Many courts have

either disallowed or reduced general compensatory damage awards deemed excessive, but such holdings have not been based on any clearly expressed criteria. We are told that the mere fact a verdict is large is not conclusive that it is the result of passion or prejudice, or other considerations not found in the evidence. Schatz v. Devitte, 75 Nev. 124, 335 P.2d 783; Wells, Inc. v. Shoemake, 64 Nev. 57, 177 P.2d 451; Burch v. Southern P. Co., supra; Forrester v. Southern P. Co., 36 Nev. 247, 134 P. 753, 136 P. 705, 48 L.R.A. (N.S.) 1; Christensen v. Floriston Paper Co., 29 Nev. 552, 92 P. 210; Taylor v. Nevada C. O. Ry., 26 Nev. 415, 69 P. 858. Further, we are advised that awards made by other juries in similar cases are not controlling, Wells, Inc. v. Shoemake, supra, though much respect appears to have been accorded the "comparison approach" in Knock v. Tonopah & G. R. R. Co., 38 Nev. 143, 145 P. 939, L.R.A. 1915F, 3, and Cutler v. Pittsburg Silver Peak, 34 Nev. 45, 116 P. 418. Such generalizations are of doubtful value.

The core of the matter seems to be that an appellate court will disallow or reduce the award if its judicial conscience is shocked; otherwise it will not. Our judicial conscience is not shocked by the award of $30,000 as general compensatory damages in this case. Viewing the record in the light most favorable to plaintiff, we find substantial evidence tending to prove actual damage to her reputation for truth, extreme embarrassment, humiliation, mental suffering and inconvenience, all coming about as the proximate consequence of the defendant's act in prosecuting her for an alleged felony.

We will now consider appellant's claim that the award of $50,000 as punitive damages is excessive. Such damages are recoverable in a malicious prosecution case. Anderson v. Snell, 57 Nev. 78, 83, 58 P.2d 1041, 62 P.2d 703. Compensatory damages must be awarded before a recovery of punitive damage is authorized. Wolf v. Bonanza Investment Co., 77 Nev. 138, 360 P.2d 360;

Novack v. Hoppin, 77 Nev. 33, 359 P.2d 390. Appellate courts are believed reluctant to disallow or reduce a punitive damage verdict, especially when the trial judge has denied a motion for new trial based upon its excessiveness. Solen v. Virginia & T. R. R. Co., 13 Nev. 106; Seffert v. Los Angeles Transit Lines, 15 Cal.Rptr. 161, 364 P.2d 337; Ostertag v. LaMont, 9 Utah 2d 130, 339 P.2d 1022. How the courts have reacted in particular cases is the subject of the annot. 35 A.L.R.2d 308, entitled "Excessiveness or inadequacy of damages for malicious prosecution." One cannot avoid thinking that the general rules offered to explain the reviewing court's decision are tailored to fit its feeling about the particular case before it. If that court does not approve the verdict it will state that the jury was motivated by passion or prejudice, Livesey v. Stock, 208 Cal. 315, 281 P. 70; or that a "reasonable relationship" between the punitive and compensatory awards does not exist, Crowell-Collier Pub. Co. v. Caldwell, 170 F.2d 941 (5th Cir. 1948); or that the amount of the award is "enormous," Crane v. Bennett, 77 App. Div. 102, 79 N.Y.S. 66. On the other hand, the reviewing court in affirming the award may rely upon the converse of the reasons just mentioned, or upon a strong presumption in favor of the verdict as confirmed by the trial judge in refusing a new trial, Ostertag v. LaMont, supra, or some other equally plausible statement. It is evident that such generalizations do not provide a workable standard in most cases.

However, in the case at bar, the record does furnish information which permits us to appraise the $50,000 punitive damage award objectively. Evidence was received relevant to the financial condition of Dr. Miller. Browand v. Scott Lumber Co., 125 Cal.App. 68, 269 P.2d 891; Marriott v. Williams, 152 Cal. 705, 93 P. 875. His net worth was established to be about $51,000. The jury may have speculated that he had undisclosed assets. If so, it stepped outside the evidence. Having already decided upon total compensatory damages of $45,000,

the jury knew the limits within which its further assessment of damages should be confined if the doctor was not to be destroyed financially. The concept of punitive damages rests upon a presumed public policy, to punish the wrongdoer for his act and to deter others from acting in similar fashion. Net worth evidence was received to aid the jury in deciding how large or how small its punitive allowance need be to promote the mentioned policy. The plaintiff had already been "made whole" by the allowance of substantial compensatory damages. Her further enrichment by the collection of additional damages labeled punitive must be justified upon the ground of public policy, and not for the reason that she has a right to such additional sum. In our judgment one may be punished without being destroyed. The public interest is not served by the doctor's financial annihilation. We conclude that the jury was, to some extent, influenced by passion and prejudice in allowing punitive damages in the amount of $50,000.[1]

3. *Other assigned errors.* Dr. Miller has assigned four errors in addition to his claim that the judgment is excessive. First, he argues that the complaint fails to state a claim for relief, because it does not aver that the doctor, in making the *criminal complaint* before the justice of the peace, filed a sworn statement in writing as required by NRS 185.030. This argument has no merit. It is directed to the sufficiency of the criminal complaint before the justice of the peace, rather than to the civil complaint for malicious prosecution which initiated the case before us. The elements of a claim for relief, i.e., want of probable cause for the criminal prosecution, malice, termination of the criminal case, and damage, were properly averred.

---

[1] At first blush it may appear inconsistent for us to conclude that the jury was not influenced by passion and prejudice in granting plaintiff $45,000 in compensatory damages, but was improperly influenced when it awarded $50,000 as punishment. This result comes about because compensatory damages are designed to make the plaintiff whole for her injury, without reference to the defendant's ability to pay, while punitive damages purpose to punish the defendant without reference to the plaintiff's injury.

Next the appellant complains that hearsay evidence was received, citing four separate instances.[2]

It is urged that newspaper articles regarding the criminal prosecution should not have been received. Such evidence was admissible on the issue of damage. Annot., 37 A.L.R. 658. It was received for that limited purpose; it was not offered to prove the truth of the statements contained therein. Cf. Las Vegas Sun v. Franklin, 74 Nev. 282, 296, 329 P.2d 867, 874.

The appellant further urges that reversible error occurred when the trial court refused two of his proffered instructions, each relating to whether he had probable cause to prosecute respondent for embezzlement. The court instructed the jury that "* * * if you find from the evidence that the defendant in good faith believed in the guilt of the plaintiff at the time of signing the complaint, and if you find that the facts given by the defendant were such as to justify the belief in the mind of a person of reasonable intelligence and caution that the plaintiff was guilty, there was probable cause and your verdict should be for the defendant; * * *." The subject of the refused instructions was thus covered by the quoted part of the given instruction; hence, no error occurred. Close v. Flanary, 77 Nev. 87, 360 P.2d 259; Pinana v. State, 76 Nev. 274, 352 P.2d 824.

Finally, the appellant contends that reversible error occurred when the court below refused to grant his motion, made pursuant to NRCP 50(a), for a directed verdict made at the close of the plaintiff's case in chief. It is his position that, though $15,000 had been returned to him before institution of the criminal case, the $180 "housekeeping money" was never returned, and that an embezzlement of the latter sum was established as a

---

[2]We shall not discuss three of the instances because, as to one, objection was not made; as to another, the offered but objected to evidence was withdrawn; and, in the third instance, the question put was never answered.

matter of law. We do not agree. We regard the evidence as to the $180 sum to be conflicting. The jury could believe that money to have been given the respondent to do with as she pleased. Nonetheless, appellant urges upon us that the issue of probable cause is always one of law, even when the evidence is in conflict. In this he is mistaken. It is only when the facts relating to probable cause are not in dispute that it becomes a question of law. Bonamy v. Zenoff, 77 Nev. 250, 362 P.2d 445. When such facts are in dispute, the issue is one of fact to be resolved by the trier of the fact.

Our study of the record discloses that there is substantial evidence to show want of probable cause for the criminal prosecution. We know that malice can properly be inferred from such want of probable cause; Bonamy v. Zenoff, supra; Gattshall v. Sizemore, 71 Nev. 106, 281 P.2d 400; McNamee v. Nesbitt, 24 Nev. 400, 56 P. 37; Cassinelli v. Cassinelli, 24 Nev. 182, 51 P. 252; Fenstermaker v. Page, 20 Nev. 290, 21 P. 322. It was for the jury to determine whether Doctor Miller had established his defense that he had acted upon advice of counsel, after seeking such advice in good faith and after a full disclosure of facts within his knowledge. Gatshall v. Sizemore, supra; Anderson v. Snell, 57 Nev. 78, 83, 58 P.2d 1041, 62 P.2d 703; McNamee v. Nesbitt, supra; Ricord v. Central P. R. R. Co., 15 Nev. 167. The jury found against him, and there is substantial evidence to support its conclusion in this regard.

4. *Conclusion.* Because of the excessive award of *special* compensatory damages and *punitive* damages, we decide that this cause must be reversed and remanded for a new trial; provided, however, that if respondent Reta Schnitzer file herein within 10 days from receipt of a copy of this opinion, a remittitur damnum to the extent of $52,000, the judgment, modified to the extent of such remission, will be affirmed.[3] Henry v. Baber, 75 Nev. 59,

---

[3] The judgment, as conditionally modified, is computed as follows: Special compensatory damages, $8,000; General compensatory damages, $30,000; Punitive damages, $5,000; Total, $43,000.

334 P.2d 839; Knock v. Tonopah & G. R. R. Co., 38 Nev. 143, 145 P. 939, L.R.A. 1915F, 3; Konig v. Nevada C. O. Ry., 36 Nev. 181, 135 P. 141; Cutler v. Pittsburg Silver Peak, 34 Nev. 45, 116 P. 418; Christensen v. Floriston Paper Co., 29 Nev. 552, 92 P. 210. No costs are allowed.

BADT, C. J., and McNAMEE, J., concur.