THOMAS A. CAMPBELL, Appellant, *v.* ROBERT T. BASKIN AND ROSE BASKIN, Respondents.

No. 3665

March 31, 1952.                                    242 P.2d 290.

See also, 68 Nev. 469, 235 P.2d 729.

*Forrest A. Betts,* of Los Angeles, California, and *Morse & Graves,* of Las Vegas, for Appellant.

*Allan K. Perry,* of Phoenix, Arizona, and *Cornwall & Compton,* of Las Vegas, for Respondents.

## OPINION

By the Court, EATHER, J.

This action was instituted by plaintiffs and respondents, Robert T. Baskin and Rose Baskin, husband and wife, to recover damages arising out of physical injuries sustained by plaintiff, Robert T. Baskin, while riding as a guest passenger of defendant and appellant, Thomas A. Campbell, in an automobile owned and operated by said defendant and appellant, resulting when the vehicle, out of control of the driver, crashed into a road embankment.

The injuries sustained by the plaintiff, Robert T. Baskin, were alleged to have been caused by the negligence of the defendant. The parties will be referred to by name, and to better appreciate the contentions of both parties it is necessary that we briefly state the facts. The accident in which Baskin sustained injuries happened on or about the 28th day of May, 1948.

At approximately 11:30 a. m. of the 28th day of May, 1948, Campbell came to the Round-Up-Drive Inn (Baskin's place of business) in Las Vegas, Nevada, and informed Baskin that he, Campbell, was going to take his boat to Willow Beach Fishing Camp in Arizona, and make arrangements for a cabin for himself and his wife over the approaching Memorial Day holiday weekend. Campbell invited Baskin to go with him and stated that they would do some fishing if they had time. Baskin agreed to meet Campbell after the lunch hour. At approximately 1 p. m. of said day Baskin drove his own car to his residence in Las Vegas and shortly thereafter Campbell drove up in his car and they left from Baskin's residence. From there Campbell drove his car in Las Vegas, Nevada, to get his trailer and boat. After hooking up his trailer and boat to his car he drove

back to a filling station where he bought and paid for gasoline for his automobile. He then drove to the Boulder City Highway, which is United States Highway No. 93 and a continuation of Arizona State Highway No. 466. He then drove out United States Highway 93 to Boulder City and on down across Hoover Dam; thence over Arizona Highway 466 for approximately 14 miles southeast of Hoover Dam, at which point he turned south and drove 4 miles over a graveled road to Willow Beach Fishing Camp arriving at approximately 3:30 p. m. of said day.

Upon arrival at said camp Campbell endeavored to secure accommodations for himself and his wife over the weekend, but was unable to do so. They thereupon placed Campbell's boat in the river. The boat was equipped with two outboard motors. They then started the large motor and went upstream approximately five miles, whereupon they switched to the trolling motor and fished upstream several miles. They both fished hard for approximately three to three and one-half hours, returning to the dock at Willow Beach just at dusk.

Upon their return to the fishing dock all equipment and supplies, except Baskin's fishing pole and tackle, were left in the boat which was tied and left at the dock for the expected use of defendant and his wife early the following morning.

Campbell again drove his automobile with Baskin as a passenger, up to the main highway, Arizona State Highway No. 466, and then turned northwest thereon, traveling approximately eight miles to a point approximately five and nine-tenths miles south and east of Hoover Dam, at which point the highway makes two compound turns to the left where the said accident occurred.

Campbell's first contention is that the evidence does not warrant the court's finding of negligence. The findings of the court in part were to the effect that "defendant's automobile, which was being operated and controlled solely by said defendant, due to the sole

negligence of the said defendant in driving at a high
rate of speed dangerous under the circumstances not
only to the occupants of his car but also to anyone on
the road, got out of control of the said defendant and
crashed into the said embankment as aforesaid; that
said defendant drove and operated said automobile at
said time and place at a rate of speed greater than the
rate of speed at which he might have kept said auto-
mobile under control.  *   *   *"

The only testimony available as to the events leading
up to the accident is that of Baskin.  As a result of the
accident Campbell suffered retrograde amnesia and had
no recollection whatsoever of any events following the
reaching of the main highway on his return from Willow
Beach.  Baskin's testimony was in part as follows:

"We came up on the top of that crest and there is a
long downward hill before you come into this turn,
and, in other words, I would say he was hitting between
fifty and sixty, and it seemed like as we started down
the car picked up a lot of speed.

"Q.  Did either of you say anything at that time?  A.
Yes, he said—he—.

"Q.  Who is 'he'?  A.  Tommy said, 'I got a dinner
date with my wife, and I'll have you home in a few
minutes, Buddy.'  I said to him.  'Slow down and take
it careful, because let's get home altogether.'  So just
at the time I got through we came right up on that curve
where that forty-mile sign is, and then he cut in from
—to the—where the road went to turn in there, he cuts
in on the line there and comes right up on the—where
he is going to make a turn, and it looks like he cuts
wide, and comes to it too wide, and scrapes the railing;
and when he scrapes it, he threw his weight over, and
when he threw his weight around the car just arched.
It seemed to me that it just arched and just turned back
the other way, and went right into the mountain and
just exploded.  In other words, it felt like he hit some-
thing that didn't move or give or anything.  And I must
have fallen out.  All I can remember is I was—had—

I was caught in the door and it was dragging me under the car and it was bumping into the mountain, and I was being mashed, and all I could think of was 'when is this going to stop? When is it going to get over with?' Suddenly it seemed like I was threw out in the canyon. * * *

"Q. Are there any signs on the road on that hill? A. There is two signs. One sign states there was a speed limit of forty miles, and down below there—I don't know how many feet, there is a curve there with diamonds in it—a very crooked curve. It was just about the time we hit this speed sign here is where we picked up speed. * * * Just past this crooked curve here— he cut right in here. * * *

"Q. In other words, when he came down, in going into the turn, he got himself on the left-hand lane, across the white solid line, is that correct, or not? A. That is correct."

Campbell contends, however, that Baskin's testimony was so thoroughly discredited that no consideration whatsoever should be given it. Certainly it must be said that a reading of the record tends to create considerable doubt as to the reliability of Baskin's testimony. Campbell points to the following:

First, that by his sworn complaint Baskin alleged that Campbell's negligent operation of the car commenced as soon as he reached the main highway and continued to the time of the accident; that by demurrer Campbell drew attention to the fact that Baskin had not shown that any protest against such negligent operation had ever been made; that on trial Baskin altered his position to show careful driving by Campbell until mere seconds before the accident occurred.

Second, that reports of the United States Rangers made shortly after the accident were to the effect that Baskin had stated that the accident was due to Campbell's car being crowded off the highway by a car traveling in the opposite direction; that as a result road blocks were established by the rangers and the

Arizona State Police; that subsequently in a statement made to an insurance adjuster and signed by Baskin this same story was reiterated by him; that the whole thereof was repudiated by him at the time of the trial.

Third, that a day prior to trial Baskin, in a deposition, had falsely testified under oath that he did not know where he and Campbell had stopped for refreshments on the way to Willow Beach; that as a matter of fact (as admitted by Baskin on trial) they had stopped at his sister's grocery, as he well knew.

Notwithstanding these most effective attacks upon his credibility, however, his story as we have quoted it and the court's findings of negligence are borne out by the physical facts of the accident as reported by other witnesses and as demonstrated by exhibits.

The physical evidence at the scene of the accident demonstrates that the car struck a guardrail to the right or north side of the road, knocking loose a length of cable and a couple of eyebolts attached to the post; that it then went into a skid in an arc across and down the road for 81 feet during the course of which skid the car itself was turning counterclockwise; that it then struck the embankment to the left or south side of the road, the point of impact being the right front of the car. The car then proceeded down the highway, rear first, for 240 feet, following the embankment on the south side of the road, coming to rest nosed into the embankment facing back towards Willow Beach with the rear of the car angling out and across the left or south side of the highway.

Campbell was so thrown from the car that his body rested about 12 or 15 yards from the car on towards Boulder City. Baskin's body was found 10 or 12 yards the other side of the car, back towards Willow Beach. It is thus apparent that in the course of the car's slowing to a complete stop there were four force-absorbing or retarding contacts; one, the original contact with the guardrail; two, the skid for 81 feet across the high-

way; three, the contact with the embankment; four, the backward progress of the car down the road for 240 feet. Each of these contacts is deserving of analysis. The first, that of the guardrail, was of sufficient force to jar loose the eyebolts and cable with corresponding retarding effect upon the car. One can do no more than guess at the extent in miles per hour of such retarding effect. As to the second, the 81-foot skid across the highway, there was considerable testimony, much of it conflicting. One witness present the night of the accident testified that there were two parallel skid marks separated by about a car width. Another testified that there was one skid mark. One witness who returned the day following the accident testified positively there were four skid marks. A moving picture taken three days later and after the marks might to some extent have been erased by traffic, showed a single mark for the full 81 feet with a second mark joining the first at about the halfway point.

One expert testified that on the basis of a four skid-mark showing, a car on that particular stretch of road would have to be traveling $45\frac{1}{2}$ miles per hour to skid 81 feet before being brought to a complete stop. A second testified the speed would be $35\frac{1}{2}$ miles per hour and that if the marks were less than four, one would be compelled to do some guessing. There is, however, testimony on the basis of which one could conclude that the retarding effect of this skid in miles per hour was between $35\frac{1}{2}$ and $45\frac{1}{2}$ miles per hour.

As to the third contact, the impact with the embankment, again one can do no more than guess. An exhibit in the form of a photograph showed the condition of the car. It is far from demolished. It had, however, quite clearly suffered a very sharp and forceful blow on its right front end, sufficient in force to break the front axle, bend or dish the right front wheel in on its lower edge, severely spring and buckle the right front door and shatter the glass in that door's window.

The impact obviously was a severe one as Baskin's testimony would indicate and, it would have had a correspondingly severe retarding effect upon the car's progress.

As to the fourth contact, that of the 240-foot progress on down the road, testimony indicates that it is improbable that the car could have coasted freely on down the hill due to the condition of the right front wheel. As one witness testified on examining the photographs: "It wouldn't roll. It took something to get it down there." As to the marks left by the car during the course of this progress, one witness stated that he had seen where something had "drug down the road." Another testified to a "disturbance" in the gravel off the edge of the road for a distance of about 75 paces. The third testified he noticed "a skid mark along the inside of the curve" for about 240 feet. Another witness testified that "if the car struck the embankment a glancing blow I believe it would be possible for it to go on down from the point of impact, continuing on; just the momentum would carry it on." A conclusion which may well be drawn from the physical facts is that the momentum of the car forced it against the drag of the right front wheel, the further distance of 240 feet after impact with the embankment before it ultimately came to rest.

The sum of these retarding effects in miles per hour would be the speed at which the car was traveling when it first collided with the guardrail. While it is impossible to arrive at any accurate estimate, in our view there is ample evidence in the physical facts of the accident themselves, from which the trial court may have concluded that the car was traveling considerably in excess of the posted limit of 40 miles per hour and that the driver, accordingly, was guilty of negligence in driving at an excessive rate of speed.

Defendant's next contention is that the court erred

in applying to the accident the law of the state of Arizona rather than that of Nevada. Under sec. 4439, N.C.L.1929, 1931–1941 Supp., a guest may not recover for personal injuries in absence of "intoxication, willful misconduct, or gross negligence of such owner, driver or person responsible for the operation of such vehicle." Arizona has no such statute and a guest may recover upon proof of simple negligence of the person responsible. In its decision the trial court stated "that the evidence failed to show wanton, willful or gross negligence on the part of the defendant, but that plaintiff's allegations with respect thereto were sufficient to include a charge and support a finding of simple negligence." The accident having occurred in Arizona it is clear that Arizona law applies. Mitrovich v. Pavlovich, 61 Nev. 62, 114 P.2d, 1084.

Defendant contends, however, that the trip was a joint venture being one of many such excursions and that under these circumstances the venture having been undertaken from Nevada the law of Nevada should apply. We need not decide whether under a proper showing of joint venture the law of Nevada would become applicable. The trial court specifically found "that it is not true that on the 28th day of May, 1948, the plaintiff, Robert T. Baskin, and the defendant were engaged in a joint enterprise; that it is not true that plaintiff, Robert T. Baskin cooperated in, actively or otherwise, or participated in the direction or operation of said automobile in which he was riding at said time and place as aforesaid;" and that the purpose of the trip was "primarily for the benefit of said defendant." Under the facts recited at the outset of this opinion it cannot be said that such findings were without support.

Defendant further contends that the evidence shows Campbell to have been intoxicated to Baskin's knowledge and that such intoxication was caused in part by liquor furnished by Baskin. It is contended that under the

Arizona case of Franco v. Vakares, 35 Ariz. 309, 277 P. 812, Baskin is thus precluded from recovery by virtue of contributory negligence. Upon this phase of the case the evidence is in a state of utmost confusion and conflict. There is much conflict as to the amount of beer purchased, as to the amount of beer and whiskey consumed, as to the evidence of alcohol upon the breath of respective parties at the time of the accident, as to their condition with reference to intoxication or sobriety upon leaving Willow Beach. Campbell himself testified, "As I stated previously any time anybody ever talked to me about this, as far as being drunk I said I wasn't cold sober and I wasn't sloppy drunk. That is as far as I can go." There is not, however, one scintilla of evidence as to whether Baskin knew or should have known that Campbell's condition was one of intoxication or to rebut Baskin's denial of any knowledge of it. The trial court stated in its decision "[the defendant] failed to prove by any competent evidence that the said plaintiff knew or should have known by the exercise of ordinary care that the defendant was under the influence of intoxicating liquor or that the defendant in fact was drunk to any degree." Certainly under the state of the record in this respect we are unable to dispute this determination.

Defendant further contends that the trial court erred in "disregarding the specific acts of negligence pleaded in plaintiff's and respondent's verified complaint and predicating its decision and its findings and its judgment on simple negligence only."

The complaint alleges that the defendant operated his automobile "wantonly, wrongfully, unlawfully, carelessly, recklessly and with gross negligence in that he operated and drove said Plymouth Coupe automobile * * * at a wanton, unlawful, dangerous and excessively high rate of speed, to-wit, at a rate of approximately 80 to 90 miles per hour: * * *" and that said defendant "drove said automobile at a rate of speed too

great to allow said defendant to negotiate said curve in said highway and remain upon the paved and traveled portion of said highway."

It would not appear that the trial court disregarded the specific acts of negligence pleaded but that the court simply found negligence to exist in a lesser degree than that alleged. It is generally recognized that under the allegations of gross negligence or of wantonness or willfulness, proof may be made and recovery had for simple negligence on the theory that the greater wrong includes the lesser. See 65 C.J.S. 946, Negligence, sec. 201.

Further the appellant contends that the damages allowed by the trial court were excessive, since the plaintiff, by failing to follow his doctor's instructions, contributed to or aggravated the injuries suffered by him as a result of the accident. As to damages the court found as follows: "As a result of the accident, due solely to the negligence of the defendant as aforesaid, said plaintiff, besides special damages, received severe personal injuries causing partial permanent disability and pain, which he will continue to suffer the rest of his life. Taking into consideration the age and occupation of said plaintiff at the time of the accident, [Baskin testified he is 54 years old] and considering the evidence applicable to damages together with various awards upheld in other cases, and considering the law with respect to the present value of damages resulting from permanent disability, the court concludes that said plaintiffs are entitled to special damages in the sum of $9,942.10, and in addition, general damages in the sum of $38,000.00 on their first cause of action, and the further sum of $500.00 on their second cause of action."

Testimony as to failure of the plaintiff to follow his doctor's instructions and consequent aggravation of his injuries is far from definite or conclusive. Neither is

there any indication in the record that the trial judge in fixing damages as he did, did not take into consideration any such possible aggravation. Accordingly we do not feel there is any merit in this contention.

Finally defendant contends that the demurrer to the complaint was improperly overruled. The complaint alleged negligence of the defendant commenced from the time he turned onto the highway, on his return trip, and continued until the time of the accident. A demurrer was interposed on the grounds that the complaint did not allege any acts on the part of the plaintiff in protest against such negligence. As we have already mentioned, at the time of the trial plaintiff abandoned his contention that the acts of negligence commenced from that point and changed his story to contend that the acts of negligence commenced only seconds before the accident happened. While this point is assigned as error it was not argued in briefs or oral argument and no authorities are cited by appellant in support of this contention in this regard. Therefore, we deem the point to have been abandoned.

Many incidental points are raised. It would appear, however, that there is substantial evidence to support the findings and that none of the assignments of error is well taken.

In the case of Shore Line Oil Co. v. King, 68 Nev. 183, 228 P.2d 395, 400–401, it is stated:

"Appellant states * * *. We are inclined to agree with this statement, which accounts for the fact that we have found it unnecessary to indulge in any extensive citation of authorities. It may be true that the facts are not as conclusive as might be hoped for, but it is apparently the result of the very nature and circumstances of the case. * * * Accordingly, as to many if not most of appellant's contentions, we are guided by the familiar rule that we will not disturb the findings if they find substantial support in the evidence."

Does the evidence in this case support the findings and judgment? We think it is clear that it does, and, it so appearing, the judgment must be affirmed.

The judgment and order denying the motion for a new trial should be affirmed, with costs.

It is so ordered.

BADT, C. J., and MERRILL, J., concur.