SOUTHERN PACIFIC COMPANY, APPELLANT, v.
ROBERT L. WATKINS, RESPONDENT.

No. 5272

December 7, 1967                    435 P.2d 498

[Rehearing denied January 25, 1968]

*Woodburn, Forman, Wedge, Blakey, Folsom and Hug,* of Reno, for Appellant.

*Breen and Young* and *Jerry Carr Whitehead,* of Reno, for Respondent.

## OPINION

By the Court, COLLINS, J.:

This is an action by Robert L. Watkins against the Southern Pacific Railroad for personal injuries and property damage suffered by him as a result of a train-car collision at a railroad

crossing. This appeal is from an order of the trial court denying a new trial, and from a judgment of the trial court based upon the verdict of a jury in favor of respondent Watkins and against appellant Southern Pacific Company for the sum of $134,737.45. The award by the jury was for compensatory damage. The jury refused a request for punitive damage against appellant.

Appellant assigns as error the following legal issues:

1. Admission of evidence of prior accidents at the same railroad crossing.

2. Reception of the testimony of witness Capshaw giving his opinion of the degree of danger at the crossing involved.

3. Reception of testimony of witness DeMers calling for his opinion as to the degree of danger at the crossing.

4. Giving of instructions Nos. 22, 23, 26 and 31.

5. Refusal to give appellant's offered instruction No. 3.

6. Refusal to permit appellant to call a witness located during the trial and not listed as one of his witnesses before trial.

7. Making the depondent, Gary Hansen, the court's witness in part.

8. Refusal to grant a new trial on the ground of excessive damages.

9. Refusal to grant a new trial on the ground that the verdict resulted from the jury's manifest disregard of the court's instructions.

The jury having found for respondent and against appellant requires that we state the facts in accordance with those findings. Robert L. Watkins of Reno was injured November 4, 1964 when his pickup truck was rammed by a locomotive at a Southern Pacific grade crossing at Sparks, Nevada, known as Stanford Way. Stanford Way is a two-lane, north-south highway. At this particular crossing, twelve sets of railroad tracks traverse Stanford Way in an east-west direction. These dozen tracks form the eastern portion of the Sparks switching yard and amount to the largest group of tracks to cross a roadway within the entire division of the Southern Pacific Co. One-half second is the normal time to traverse a railroad crossing. To cross Stanford Way it requires approximately fourteen times as long. The surface of the crossing is very rough and tends to create a noise that is distracting to drivers. The crossing is very active. It had an estimated auto traffic of 4,300 motor vehicles on the day of the accident. Its train traffic, on the

average, consisted of 8,500 trains per year, in addition to some 10 to 55 switching operations which crossed the roadway daily. The crossing has no electronic gates, gongs, or other devices to warn motorists of the approach of locomotives or trains.

There was conflicting evidence as to the light level required and maintained at the crossing by Southern Pacific Co. Testimony indicated that the American Standards Association recommendations call for at least one foot-candle of light on railroad crossings, and for as much as 5 foot-candles if the crossing is of an industrial nature. One expert testified that he found, through photometer tests, the level of light to vary between 1.35 and .35 foot-candles. Another stated it was as low as .35 on the road, .13 only 30 feet from the roadway, and only .015 at a point on the road 100 feet south of the tracks. The experts further related that the lighting should not be spotty because such lighting causes a substantial impairment of vision. Minimum standards were said to require a variance of less than 3 to 1, whereas evidence indicated the ratio of variance at this crossing to be as great as 12 to 1. One expert said that it would be safer to remove all lighting rather than to maintain it in such an irregular state.

Evidence indicated that the Southern Pacific Co. was placed on notice of the increasing traffic conditions and dangerous defect of the crossing. It included the following:

1. That at the request of the City of Sparks, a meeting was held between city and railroad officials to discuss the accident rate at the crossing wherein the city officials asked the railroad to post flagmen at the crossing or to otherwise protect the public. The railroad took no action.

2. That the railroad had taken no action upon a promise to the Sparks city council by a railroad executive to recommend the provision of more light at the crossing.

3. That the railroad secured an injunction against the Sparks city council's attempted remedy of the situation, by enactment of an ordinance requiring flagmen at the crossing.

4. That during the 10 months preceding this particular accident, seven other accidents under somewhat similar conditions had occurred at the Stanford Way Crossing and the railroad had yet to have the crossing examined by lighting or safety engineers.

5. That the Southern Pacific Co. was informed by an engineer for Sierra Pacific Power Co. that the lighting at the Stanford Way Crossing for the roadway and the 200 feet of adjoining track could be increased to 5 foot-candles for the cost of $2,500 and that the railroad company indicated it did not intend to improve the lighting.

The locomotive involved in the accident is a roadswitcher, larger, more powerful and of a different design than a normal switch engine. It is over 55 feet in length, weighs approximately 250,000 pounds and is black in color. When the engine is moving in a reverse motion, the length of the engine precedes the cab containing the engineer and fireman. While in reverse the engineer's field of vision from the cab is limited to his side of the engine. The fireman's vision is equally limited on the opposite side. The function of the fireman is to be the eyes of the engineer as to things on his side of the engine and either to relay a warning or in an emergency to actuate a brake available to him. A few months before the Watkins' injury, the Southern Pacific Railroad removed firemen from the engines in the Sparks yard. Since they were not replaced by other available employees who would serve as lookouts, the result was that every time such an engine crossed Stanford Way, the engineer drove blind as to one direction of the vehicular traffic, a condition which was aggravated even further when travelling in reverse. The Southern Pacific Co. had been notified that the removal of the firemen hampered the effective visibility of the engineer and thus constituted a hazard.

Witnesses testified that, on the night of the injury, two or more boxcars were located on the middle tracks east of the crossing. Due to the switching operations at this crossing it was admittedly common practice to park boxcars in proximity to the roadway, both east and west of the road on the 12 tracks and in ever-changing positions. This not only tended to hide on-coming trains from the view of the passing motorists but was also a violation of the railroad rules.

A few minutes before 2:00 a.m., on the night in question, the crew of No. 5628 had completed its work and were temporarily idle. The foreman of the crew then directed his engineer to proceed, along with one of his two switchmen, from his position 2,000 feet west of the crossing, forward across Stanford Way, to switch on to a different track, and to return, necessarily in a backward motion, across the roadway to the middle of the switchyard in order to await further work assignments. Both the foreman and the switchmen were equipped with lanterns. None of these employees were told to or did position themselves at the Stanford Way crossing to warn motorists of the approaching engine.

At approximately 2:05 a.m., Robert Watkins, returning home from work, drove to the edge of the Stanford Way Crossing. At that time the night was dark, the moon had set, the skies were overcast and the temperature had dropped to 19 degrees. He stopped his pickup truck just north of the crossing

and was facing south. He looked both right (west) and left (east). He observed boxcars parked on various tracks, on both sides of the crossing. After neither seeing nor hearing any evidence of an approaching train, he proceeded across the tracks in low gear. He cleared the boxcars located on the east side of the crossing and was then struck on the seventh track by locomotive 5628.

Watkins testified that he heard no warning sounds nor saw any lights, either headlights or warning lights, on the train. Although he had drunk two bottles of beer, there was no evidence of intoxication offered by the police officer who lifted him from the truck or the physician who treated him at the hospital. A witness called by respondent who was stopped on the south side of the crossing some 50 feet from the collision, testified that the window of her car was out and that while she listened, she heard no warning signals, whistles or bells but only the sound of the motor. She testified that she saw no warning lights. Another witness for respondent, who was also approximately 50 feet from the collision, testified that although he heard the sound of the engine's motor, he did not hear any audible warnings. He observed no light on the engine as he saw it strike the truck. He further testified that when he reached the engine immediately after the collision, the engine was very dark and without lights. In order to see, he stated that it was necessary for him to return to his car to get a flashlight.

On the other hand, the railroad crew testified that they heard the two longs and short and a long whistle required by law to be given at all crossings. A railroad foreman approximately 2,000 feet from the collision testified he heard each whistle distinctly. The crew admitted that the oscillating light on the rear of the engine was not used, but contended that a fixed-beam spotlight was on at the time of the accident.

The engineer, operating engine No. 5628, told investigating officers immediately after the accident that he was unable to see the truck. He repeated several times that the injury would not have occurred if he had a fireman to warn him that the truck was on the road.

The speed limit for switch engines at the Stanford Way Crossing is 8 miles per hour. In addition, the engine was traveling "on caution," which meant that it must be able to stop short of anything located on the tracks. By police measurements the engine drove Robert Watkins' truck sideways 125 feet before it came to a halt. The truck, however, did not stop until it became lodged against boxcars on an adjacent track. An experienced former railroad engineer testified that an engine

without boxcars under conditions testified to would have been traveling in excess of 15 miles per hour to take that distance to stop. One witness, who observed the accident, estimated the speed of the engine at 20 to 25 miles an hour and another estimated that the engine was going in excess of 20 miles per hour. The engineer of the locomotive testified he was unable to say what his speed was and refused to estimate. He did admit that he had, since the accident, traveled over the crossing at speeds of 15 miles per hour and that the company had never informed him of the speed limit at the crossing, which he believed to be 20 miles per hour. The railroad company stated that is was impossible for it to estimate the speed of the engine by utilizing stopping distances, although it did admit that the engine could obtain a speed of 20 to 25 miles per hour in the distance involved.

The testimony and evidence on behalf of Robert Watkins as to his injuries were unrefuted by appellant. An ambulance driver described Mr. Watkins' injuries as ugly wounds with the flesh laid open. A police officer testified that when he arrived, Mr. Watkins was going in to shock and had suffered a compound fracture of the left leg. The diagnosis was a compound, comminuted, segmented fracture of the left tibia and fibula, as well as a dislocation of the left hip, accompanied by the breaking off of a portion of the head of the femur, the weight-bearing bone. There were also numerous lacerations and contusions of both legs resulting in the severing of nerves and tendons. The damage and tearing of the flesh were extensive, not only at the fracture site but also at the location of the nerve and tendon damage.

Evidence of Mr. Watkins' medical treatment indicates that he was given a spinal anaesthetic in the emergency room. It was not successful and was required to be repeated twice before it dulled the pain. In surgery the left hip was forced back into proper alignment in the socket. In order to maintain this position, a large, metal nail was inserted directly through the flesh and bone of the upper leg. The surgeon then cut away dead bone and tissue and sewed together the tendons and nerves. The fracture was extremely unstable and required four screws to stabilize it. The entire leg was then encased in a cast and Watkins was placed in skeletal traction with weights suspended from both ends of his body. He was hospitalized in a horizontal position until December 24 of that year. At that time he was released from the hospital in a full-length, non-weight-bearing cast.

Post-operative difficulties developed shortly after his discharge. They began with loss of skin around the fracture and

developed into a large defect of the bone. The patient developed five large draining holes (sinuses) in the flesh leading directly to the bone in the lower leg. In January 1965 he was again returned to the hospital. The wounds were reopened and pieces of dead bone, devitalized by lack of circulation, were removed, and an attempt was made to cut out the infected area.

When the cast was finally removed on May 13, 1965, the left leg was placed in a DelBay brace, which is constructed of heavy steel and leather, and covers the skin to the knee. He was required to wear that brace for an additional seven months.

The evidence at the time of the trial indicated the character of the skin surrounding the original fracture site was still very thin, reddened, inflamed and adhering to the bone. The multiple draining holes (sinuses) over the site of the fracture were still present. There remained in the bone a chronic infection which is a Streptococcus type of osteomyelitis. Repeated episodes or flareups of redness and pain will require further surgical, multiple procedure, and will require transferring flaps of skin from the good leg to cover the bone because the bad skin with poor nutrition breaks down and repeatedly drains. An additional operation, a sequestrectomy, will be necessary to remove the dead bone from Watkins' leg. The doctor testified also that Watkins had to be careful of falling because a fall of a lesser magnitude than would harm a normal person would cause his leg bone to break, and if broken, the patient would have to face possible amputation. There is atrophy of the left leg so that the left thigh is now 2 inches smaller than the right, and the left calf has become slightly smaller. The injuries have resulted in a 75 percent loss of motion of the ankle and a further loss of flection of the knee in excess of 60 percent.

The respondent Watkins is a 42-year-old former professional athlete whose regular recreation included golf, hunting, fishing, working out with weights, dancing, and both snow and water skiing. He also was an instructor in scuba diving. Since the accident he has been unable to participate in violent sports such as skiing because of the danger of refracturing the leg. He is unable to dance, cannot walk any substantial distance, and is precluded from hunting.

The osteomyelitis requires a bandage over the leg at all times because of the constant drainage. It must be changed daily. The drainage soils sheets, pajamas and clothes and causes an offensive odor. It requires that an aerosol can be maintained at hand to reduce the odor so that others are not offended.

He is now unable to move up and down the bar at work as he did in the past because of the difficulty with his leg. He has

to pull his leg to move back and forth. When he works three or four hours he is quite fatigued. His ankle hurts, his knee is painful, and the use of his leg causes postural difficulties with his back. He is unable to work except as a relief bartender when one is needed.

As to the issue of monetary loss, the following evidence was presented:

1. Medical expenses and property loss (respondent's truck) to the date of the trial of $6,173.45.

2. Lost wages due to unemployment for 8 months of $3,936; loss due to a wage increase while unemployed of $6,912; wages earned during the following year from working part time of $3,911; the wages lost amounting to $7,037 as of the date of trial.

3. Future medical expenses of $5,000 for an operation on the fracture site, plus additional costs for removal of the knee-cap, the possible amputation of the left leg, treatment of the head of the femur, treatment of any traumatic arthritis of the hip which develops, treatment for cancerous developments in the open sinuses of the leg, and routine examination of the injuries in the future.

4. Future lost wages of $75,000, a figure based upon the stipulated 30-year life expectancy of the respondent.

Respondent, in his case in chief, offered evidence without objection that there had been a number of prior accidents at Stanford Way; that the Mayor and City Council of Sparks were concerned about the accident rate at that crossing, and had conferred with railroad officials about their concern and possible solutions; that more accidents were happening at that railroad crossing than the rest of Sparks combined; that an accident had happened just two weeks prior to the instant case at the same time of the morning in the same crossing. On the fourth day of the trial respondent offered into evidence from answers to interrogatories some 55 lines of information. Interspersed among this information were the dates of several nighttime collisions which had occurred at Stanford Way in the 10 months preceding the case. Appellant objected to such evidence for the first time, contending it was error to allow evidence of prior accidents and cited as his principal authority Southern Pacific Co. v. Harris, 80 Nev. 426, 395 P.2d 767 (1964). The objection was overruled by the court which announced it would admit the evidence "for the purpose of notice of showng the alleged dangerous situation * * * in regard to the Stanford Way Crossing, the similarity, the cold winter months, the alleged inadequacy of lighting which is a similarity that existed

with the others [accidents] * * *." Thereafter additional evidence was allowed to go before the jury as to the time when the prior accidents occurred.

Appellant contends that prejudice accrues in admitting such type of evidence in that it places before the jury evidence which has no foundation to show that it has probative value; that respondent and the court failed to tell the jury that it was admitted only for the purpose of showing notice to appellant of a dangerous condition; that there were no similarities between the present accident and the previous accidents; that no foundation was laid for proof of the prior accidents; that in each instance the collision was between two moving objects, that is, a train and a motor vehicle and did not involve the dangerous condition of a permanent or stationary object; that it injected into the trial of the cause many collateral issues which would require proof, thereby unduly delaying and extending the time and scope of the trial at hand; that such evidence tends to draw away the minds of the jury from the point in issue and excite prejudice and mislead them; that the adverse party having no prior notice of such evidence is not prepared to rebut it; that the evidence was wholly inadmissible and to admit it constituted prejudice of the worst sort.

Respondent, on the other hand, contends that the issue raised by appellant as to prior accidents is not properly before the appeal court; that testimony of the prior accidents was previously admitted into evidence without objection by either party; that prior accidents are properly admitted to show notice of a dangerous permanent condition; that the holding in Southern Pacific Co. v. Harris, supra, is limited to accidents where the condition of the crossing was not a proximate or concurring cause of the accident; that the admission of prior accidents to show notice of a permanent dangerous condition is committed to the sound discretion of the trial judge; that inadmissible evidence is not prejudicial when like evidence was admitted without objection.

We have serious doubt that the issue raised by appellant concerning the introduction of evidence as to prior accidents is properly before this court. The 1960 case of Barra v. Dumais, 76 Nev. 409, 414, 356 P.2d 124 (1960), holds: "Under these circumstances we find no error on the part of the trial court in overruling petitioner's objection to the testimony or denying petitioner's motion to strike the same as hearsay, for the reason that neither the objection nor motion was timely made. * * *"

Moreover, the case of Wagon Wheel v. Mavrogan, 78 Nev. 126, 369 P.2d 688 (1962), states: "It is clear from the record

that the objection was not timely made. The same evidence had been previously received without objection. Accordingly, there is no substance to this claim of error." Also see 1 Wigmore on Evidence, Evidence in Trials in Common Law, 1964 Supplement, § 18, p. 86; and McCormick on Evidence, 1954, § 52, p. 115.

Notwithstanding such doubt, however, we feel that evidence of prior accidents is properly admitted to show notice of a dangerous permanent condition where the physical condition of the crossing as a proximate or concurring cause of the accident is in issue and there is prior admissible evidence tending to show the dangerous condition. Respondent in his pleadings stated his cause of action on two different theories: (1) against the railroad for allowing the maintenance of a dangerous crossing which was a proximate and concurring cause of the accident after having been notified thereof, and (2) that the railroad through its agents, the engineer, foreman and signalman, was negligent.

A railroad owes a duty of care to the general public to maintain a reasonably safe crossing for those persons using the crossing and in the operation of its equipment so as not to injure negligently any person who has occasion to use it. "The judicial function is to decide whether the crossing, as it existed, was maintained with reasonable care in the light of the conditions there present. Lowry v. Seaboard Airline R. Co., 171 F.2d 625. * * * What is ordinary care at one crossing may be quite different from ordinary care at another. Absent legislative demand or the requirements of custom and usage, the issue of ordinary care must be decided in the light of conditions existing at the place of the crossing accident." Southern Pacific Co. v. Harris, supra, 432, 433.

The prohibition of Harris, supra, against evidence of prior accidents at the same location does not apply in this case. Harris held, "There is no evidence to indicate that the physical condition of the crossing itself was either the proximate or a concurring cause of the collision." Id. 431; and "* * * that evidence of the occurrence of prior collisions at the same railroad crossing was not probative of any issue in this case, and should have been excluded." Id. 432. Here there is evidence to indicate that the physical condition of the crossing was the

proximate or concurring cause of the collision. That evidence includes: a crossing over the largest group of tracks in the railroad's division; the time required to transverse those tracks; the roughness of the crossing; the activity at the crossing, both of rail and motor vehicles; the absence of warning devices at the crossing; the light level required and maintained at the crossing; the construction and operation of the switching engine; the changing positions of railroad vehicles at and near the crossing; the conduct of railroad employees at the crossing.

The early Nevada case of Powell v. N.C.&O. Railway, 28 Nev. 40, 78 P. 978 (1904), holds as general law that prior accidents are admissible to show notice, if there is a condition of permanency. The condition of permanency there was the sounding of a whistle at railroad shops, which caused a horse to take fright and run with a buggy. The Powell case cites with approval Dist. of Columbia v. Armes, 107 U.S. 519 (1883), where in a suit to recover damages from a fall caused by a defective sidewalk, it was held competent to show other accidents while it was in the same condition. The United States Supreme Court said in that case, "The frequency of accidents at a particular place would seem to be good evidence of its dangerous character,—at least, it is some evidence to that effect. * * *"

A recent A.L.R.2d annotation on "Admissibility on issue of defendant's negligence in respect of condition of place where plaintiff was injured, of evidence of prior accidents or injuries at same place" has this to say in its summary (70 A.L.R.2d 171, 172):

"While a few courts still tend to look with general disfavor upon proffers of evidence of similar accidents occurring at the same place where plaintiff was injured, it now seems to be generally recognized that such evidence has some logical tendency to establish various matters pertinent to the plaintiff's case, particularly that the condition complained of was in fact dangerous to frequenters of the place in question and that defendant was informed of that potential danger.

"The pertinence of such evidence is, of course, drawn from the facts that the various accidents occurred at the same place and under conditions which were at least substantially similar, and the courts have frequently emphasized the necessity of showing such similarity of conditions as a predicate for the admission of the evidence. However, it has usually been held that only substantial similarity of conditions is required, and there is perhaps evident a trend—probably part of a general trend toward the more liberal admission of evidence—toward

treating the question of sufficiency of similarity of conditions as primarily a matter for the trial court's discretion, and to freely admit the evidence of the prior accident together with evidence of variations in conditions, which is treated as going to weight rather than admissibility.

"The strongest attack on evidence of the type here considered has been based upon grounds of trial convenience rather than upon its lack of relevance. Especially in the earlier cases, the courts have expessed the fear that if the evidence were received the trial would be disrupted by the necessity of investigating all the circumstances of the various incidents in question, and have concluded that the simplest and most desirable solution was to exclude all such evidence. However, in the more recent decisions in most jurisdictions there is apparent a tendency to treat this question ad hoc, leaving it to the trial judge in each case to determine whether the evidence should be excluded on this ground and, if the evidence is admitted, to determine the extent to which the circumstances of the earlier accident can be investigated."

A well-reasoned case supporting the admissibility of evidence of prior accidents not exactly similar is Evans v. Pennsylvania R. Co., 255 F.2d 205 (3 Cir. 1958[1]), where the court said: "Nor do we feel that the Court below erred in admitting evidence of these prior accidents at the same intersection under circumstances not exactly similar to those in the instant case. All these accidents happened at this particular crossing, took place at night and occurred between one of the defendant's trains and an automobile. Under such circumstances as these, and where the offer of evidence is to prove, not negligence, but notice of the dangerous character of the crossing, the strictness of the requirement of similarity of conditions has frequently been relaxed." Accord: Atlantic Coast Line R. Co. v. Hadlock, 180 F.2d 105 (5 Cir. 1950); Magnuson v. City of Stockton, 3 P.2d 30 (Cal.App. 1931).

The trial court, in ruling upon admissibility of evidence of prior accidents outside the presence of the jury, limited it to the question of notice to the railroad and to those prior accidents which bore a similarity to the accident on trial and which occurred during the cold winter months and under inadequate

---

[1]We are aware that this court in the Harris opinion rejected the holding of Evans v. Pennsylvania R. Co., but because the holding of Harris on that point was dictum we are not bound.

lighting. The jury was never informed at the time the evidence was admitted before them or during their instruction on law, of the limited purpose for which the evidence was received. However, appellant cannot complain. There is nothing in the record to show that appellant ever requested such a limiting instruction. Southern Pacific Co. v. Barnes, 415 P.2d 579 (Ariz.App. 1966).

Accordingly, we hold that where a dangerous or hazardous, continuing condition is in issue as the proximate or concurring cause of an accident, and there has been other evidence admitted of that condition, evidence of prior accidents at that place, though not exactly similar, may be admitted to show notice to the person reponsible for that condition. This pronouncement leaves open the question of admissibility of prior accidents to establish the dangerous condition itself. We shall deal with that question when presented to us.

In the case before us, even if the admission of the evidence in question had constituted error, which we expressly hold was not the case, it would not, it seems, have been of a prejudicial nature. The record, as previously discussed, clearly discloses that other evidence, not of the same accident, but of other accidents and the crossing's high accident rate, was admitted without objection. Louisville & N. R. Co. v. Bean, 174 S.E. 209 (Ga.App. 1934).

The next assignment of error urged by appellant is the admission by the trial court of the opinion of Frank Capshaw, an expert witness, that the crossing was "very dangerous." We feel that the expert testimony was properly admitted.

Appellant contends that it was error to permit Mr. Capshaw, who qualified as an expert in traffic control, to testify to the degree of danger at Stanford Way Crossing on the ground that such testimony invaded the province of the jury in determining an ultimate fact. There is a distinction between evidenciary facts and ultimate facts. Evidentiary facts furnish evidence of the existence of other facts and are directly established by the testimony or other evidence. Ultimate facts are the logical conclusions deduced from primary evidenciary facts.

The ultimate issue in this case was whether the Southern Pacific Company was negligent toward respondent which proximately resulted in his injury and damage. The predicate of that negligence could be either the maintenance of a dangerous condition at the crossing after being notified of that condition, or operation of the switch engine through its agents.

The clear trend in the law of evidence is, however, that an expert witness, in his field of expertise may testify to matters which embrace the ultimate issues to be decided by the triers of fact. We are of the opinion that traffic control, safety planning and evaluation of data is a growing and complex field recognized as a specialty. The witness, Mr. Capshaw, was accepted by the court as an expert. The evidence showed he received a degree from the University of Texas specializing in the field and has worked full time for seven years in the occupation. At the time of the trial he was a traffic safety engineer for the City of Reno and had previously held similar positions in New Mexico and Texas. The evidence also showed that Mr. Capshaw had exercised professional responsibility over 35 mainline railroad crossings, had personally studied the Stanford Way Crossing, and had been across it many times. There was a great mass of facts and data for the jury to digest and evaluate concerning the Stanford Way Crossing. This included the volume of motor vehicle traffic; the percentage of it that was commercial; the volume of passenger train traffic and freight train traffic; the daily switching operations; the number of tracks and their grade of descent; the rate of train speed; the rate of motor vehicle speed; the accident ratio; the calculations as to exposure time on the Stanford Way tracks; the roughness of the crossing surface; the exposure time on average tracks; the noise level at the crossing; extensive material on light readings maintained by the railroad on the road and on adjacent areas; the reflectance value of the luminaries; ratio of light levels; the glare factor; and existence of hazards to visibility. It appears doubtful to us that an average juror is so well equipped and knowledgeable to be able to evaluate all those many factors and arrive at his own unaided opinion, according to each his proper weight and value as to the dangerous condition of the crossing. While Nevada has yet to adopt the Uniform Rules of Evidence, nevertheless the trend is disclosed by subsection 4 and Rule 56 which provides as follows: "Testimony in the form of opinions or inferences otherwise admissible under these rules is not objectionable because it embraces

the ultimate issue or issues to be decided by the trier of the fact."

In the case of Wells Truckways v. Cebrian, 265 P.2d 557 (Cal.App. 1954), the court quoted from 20 American Jurisprudence, p. 654, as follows:

"It is certainly contrary to the unmistakable trend of authority to exclude expert opinion testimony merely upon the ground that it amounts to an opinion upon ultimate facts. The modern tendency is to make no distinction between evidential and ultimate facts subject to the expert opinion.

The United States Supreme Court held in the case of Transportation Line v. Hope, 95 U.S. 297 (1887): "The witness was an expert, and was called and testified as such. His knowledge and experience fairly entitled him to that position. It is permitted to ask questions of a witness of this class which cannot be put to ordinary witnesses. It is not an objection, as is assumed, that he was asked a question involving the point to be decided by the jury. As an expert, he could properly aid the jury by such evidence, although it would not be competent to be given by an ordinary witness."

Another federal case, Jones v. Goodlove, 334 F.2d 90 (8 Cir. 1964), states, "Once again we reiterate that 'this court is committed to the view that expert testimony is not vulnerable to an objection that it invades the province of the jury; that the qualification of the expert and the question of whether expert opinion upon the subject matter should be permitted are questions which should be determined by the trial court in the exercise of sound discretion. The trial court's ruling upon the admissibility of expert testimony will not be disturbed upon appeal in the absence of a clear showing of abuse of discretion.' "

Our own court said in McLeod v. Miller & Lux, 40 Nev. 447, 478, 153 P. 566 (1917), "Where, because they are unknown, it is impossible to apply fixed natural laws to a solution of the problem, courts must resort to the best means available of determining, if possible, the truth of the case. Hence expert testimony may be considered, as well as facts established by the testimony of other witnesses; but, as before pointed out, non-expert witnesses may not be permitted to invade the province of the jury and testify directly to the ultimate fact in the case." Also see State v. Kuhl, 42 Nev. 185, 175 P. 190 (1918); and Mikulich v. Carner, 69 Nev. 50, 240 P.2d 873 (1952).

A good summary of the rule in the several state and federal jurisdictions can be found in "Opinions on Ultimate Facts: Status, Trends, and a Note of Caution," William B. Stoebuck, 41 Denver Law Center Journal 226 (1964). See also "The Role and Rights of the Expert Witness," Charles M. Cook, 9 Journal of Forensic Sciences 456 (1964); "Expert Opinion and the Ultimate Issue Doctrine," 22 Md.L.Rev. 32 (1962); "Evidence—Motor Vehicle Collision—Admissibility of Safety Expert's Opinion Testimony," 46 Ia.L.Rev. 909 (1961); "Some Observations upon the Opinion Rule and Expert Testimony," Charles T. McCormick, 23 Tex.L.Rev. 109 (1945); "Evidence—Expert Witnesses—Opinion on the Ultimate Fact," 17 Wash.L.Rev. 226 (1942).

Moreover, the appellant itself introduced an exhibit which stated that "a hazardous condition to motor vehicles exists at Stanford Way." This was defendant's exhibit 1 admitted in evidence which consisted of an ordinance of the City of Sparks to which were attached several suggestions from the Sierra Pacific Power Company as to the installation of lights to increase the illumination upon the Stanford Way Crossing and the publication of that ordinance in the Sparks Tribune. Under those circumstances appellant cannot complain.

Appellant next assigns as error that Dr. DeMers, a councilman from the City of Sparks, was permitted to testify at length with respect to meetings, both formal and informal, with representatives of the Southern Pacific Company with regard to the conditions of hazard at the Stanford Way Crossing. Appellant may not, however, complain about Dr. DeMers' testimony because the only testimony elicited from him concerning the dangerous or hazardous condition at the Stanford Way Crossing was elicited by appellant on cross-examination. Counsel for appellant during the cross-examination of Dr. DeMers inquired about conversations with the Sparks city engineer and asked, "Q. You don't have any specific recollection of what he said to you? A. My specific recollection is that almost every one agreed that this was a very dangerous crossing and something should be done about it."

Next, appellant complains about the giving of instructions

Nos. 22[2] and 23[3] by the court whereby it submitted to the jury the issues of wanton misconduct on the part of the appellant.

Appellant says, "The evidence taken most favorably to the respondent does not show anything in the nature of wanton and reckless misconduct as defined by our court. We have been unable to find any case in America which holds imperfect illumination of an area to amount to anything more than simple negligence." Appellant complains that in submitting to the jury the issue of wantonness on the record here, counsel were permitted to argue the appellant's claimed bad conduct which infected the proceedings below and prejudiced appellant's substantial rights as regards compensatory damages.

Respondent, on the other hand, contends that it is proper for the court to instruct upon wanton misconduct when there is evidence that the railroad at a very busy location maintains a crossing with more than twice the number of tracks at any other crossing at which the lighting was grossly inadequate, where it maintained no electronic gates or signals or flagmen to warn motorists of approaching trains, and then to drive blind a locomotive at night into the intersection, at a speed three times the speed limit, from behind an obstruction running without lights or giving any audible warning to the motorist.

In Rocky Mountain Produce v. Johnson, 78 Nev. 44, 369 P.2d 198 (1962), this court defined wanton misconduct as, "* * * an intention to perform an act that the actor knows, or should know, will very probably cause harm." The holding further states that if reasonable minds might differ in drawing a conclusion from the facts presented, the jury should be permitted to decide the issue as an issue of fact.

From a review of the evidence in the record in this case, set forth before in this opinion, we are of the opinion that there were adequate facts presented to warrant the giving of the instruction.

---

[2]"22 Plaintiff claims that defendants, Elmer Dinan and Southern Pacific Company, were guilty of wanton misconduct. Contributory negligence is not a defense to a cause of action for wanton misconduct. If either defendant is found guilty of wanton misconduct, then you need not consider at all the claim of said defendants that the plaintiff was guilty of contributory negligence, but should you find that plaintiff's conduct constituted reckless disregard for his own safety, then he cannot recover from either defendant."

[3]"23 Wanton or reckless misconduct occurs when a person with no intent to cause harm, intentionally performs an act or intentionally fails to perform an act so unreasonable and dangerous that he knows or should know it is highly probable that harm will result."

Appellant also complains of the giving of instruction No. 26.[4] The instruction contains language approved by this court in L.A. & S.L.R. Co. v. Umbaugh, 61 Nev. 214, 123 P.2d 224 (1942). We also held in Rocky Mountain Produce v. Johnson, 78 Nev. 44, 369 P.2d 198 (1962), "Each party to a law suit is entitled to have the jury instructed on all of his theories of the case that are supported by the pleadings and the evidence." We find no error.

Appellant next complains that in giving instruction No. 29[5] the court was not supported by evidence in the record because the engine never was 1,320 feet from the crossing. The fact that the locomotive in question never was 1,320 feet from the crossing seems to beg the question because the implication of the statute is that it must be blown from that point toward, into and across the crossing. The instruction is a recital of a criminal statute (NRS 705.430)[6] and if the jury found a violation thereof by appellant or its agents which would constitute the proximate cause of an accident, it would amount to negligence as a matter of law.

The use of a violation of a criminal statute as the basis for common-law negligence has been upheld in this state, as well

[4]"26   Travelers using a public highway have the same right to the use of a grade crossing as the railroad company has; their rights are mutual and reciprocal."

[5]"29   Every engineer driving a locomotive on any railway who shall fail to ring the bell or sound the whistle upon such locomotive, or cause the same to be rung or sounded, at least 80 rods (1,320 feet) from any place where such railway crosses a traveled road or street, where such road or street is customarily used by the public for the purpose of travel (except in cities where other regulations are required), or to continue the ringing of such bell or sounding of such whistle until such locomotive shall have crossed such road or street, shall be guilty of a misdemeanor.

"A violation of this statute which is a proximate cause of an accident constitutes negligence as a matter of law."

[6]705.430   "Every engineer driving a locomotive on any railway who shall fail to ring the bell or sound the whistle upon such locomotive, or cause the same to be rung or sounded, at least 80 rods from any place where such railway crosses a traveled road or street, where such road or street is customarily used by the public for the purpose of travel (except in cities where other regulations are required), or to continue the ringing of such bell or sounding of such whistle until such locomotive shall have crossed such road or street, shall be guilty of a misdemeanor."

as in many others. In Ryan v. Manhattan Big Four Mining Co., 38 Nev. 92, 145 P. 907 (1914), this court stated that it "has been held, as a general proposition, that whenever an act is enjoined or prohibited by law, and the violation of the statute is made a misdemeanor, any injury to the person of another, caused by such violation, is the subject of an action, and that the violation of the law is the basis of the right to recover, and constitutes negligence *per se.*" Id. p. 100.

Prosser on Torts, § 35 (3d Ed. 1964), states: "The standard of conduct required of a reasonable man may be prescribed by legislative enactment. When a statute provides that under certain circumstances particular acts shall or shall not be done, it may be interpreted as fixing a standard for all members of the community, from which it is negligence to deviate. Within the limits of municipal authority, the same may be true of ordinances. The fact that such legislation is usually penal in character, and carries with it a criminal penalty, will not prevent its use in imposing civil liability, except in the comparatively rare case where the penalty is made payable to the person injured, and clearly is intended to be in lieu of all other compensation." See also Morris, The Relation of Criminal Statutes to Tort Liability, 1933, 46 Harv.L.Rev. 453: Morris, The Role of Criminal Statutes and Negligence Action, 1949, 49 Colo.L. Rev. 21.

Appellant also complains of the giving of instruction No. 31[7] which it contends constitutes a commentary upon the evidence. We do not so find. The instruction must be read with other instructions given by the trial judge, namely, instruction No. 1, "It is your exclusive province to determine the facts," and instruction No. 2, "I have not expressed, nor intended to express, nor have I intended to intimate, any opinion as to which witnesses are or are not worthy of belief, what facts are or are not established; or what inference should be drawn from the evidence. If any expression of mine has seemed to indicate an opinion relating to any of these matters, I instruct you to

---

[7]"31   Although the fact that a railroad backed or pushed a train or engine over a crossing, with or without giving a proper warning, does not generally relieve the traveler, approaching or attempting to cross the track, of his obligation to exercise ordinary care for his own safety, the fact of the backing or pushing movement of a train or engine, particularly where such movement is made without an adequate warning to indicate the direction of the movement or other proper warning to protect travelers, can be a circumstance tending to rebut the charge of contributory negligence in an action for a collision with the train or engine.

disregard it," and instruction No. 3, "* * * You are not to single out any certain sentence * * * you are to consider all the instructions as a whole and to regard each in light of all the others," and instruction No. 10, "* * * You must decide the case upon the evidence offered and admitted in open court."

While instruction No. 31 is not a masterpiece of clarity, it nevertheless can be read to contain conditional language, especially when considered by the jury along with the other general instructions quoted above.

Appellant contends it was error for the trial court to fail to give its offered instruction No. 3. The proposed instruction of appellant was 82 lines in length. The instruction purported to set forth all the issues in the case. The court instead covered this area by other instructions, among them, instructions 11, 22, 36, 37, 41 and 43. In all, the court gave 47 instructions. A reading of these instructions shows that the jury was adequately instructed in this case. It is not error to refuse instruction where its substance is adequately covered in other instructions. Burch v. Southern Pacific, 32 Nev. 75, 104 P. 225 (1909); Thompson v. Thompson, 49 Nev. 375, 247 P. 545 (1926); Close v. Flanary, 77 Nev. 87, 360 P.2d 259 (1961).

Next appellant complains that the court refused to allow it to call a witness. The name and address of the witness had not been supplied to respondent in answer to interrogatories or during the pretrial hearing, as ordered by the court. We feel the trial court had discretion in this area and see no particular abuse of its discretion in excluding a witness whose name is not given in response to proper discovery requests. Evtush v. Hudson Bus Transportation Co., 81 A.2d 6 (N.J. 1951); Battershell v. Bowman Dairy Co., 185 N.E.2d 340 (Ill.App. 1961).

Appellant also complains the trial court committed error when, after appellant had read into evidence part of a deposition, the trial court made the deponent its witness as to the rest of the deposition and thereby allegedly relieved respondent of being bound by that portion of the testimony.

We perceive no error in this action of the trial court. NRCP 26(d)(4) provides: "If only part of a deposition is offered in evidence by a party, an adverse party may require him to

introduce all of it which is relevant to the part introduced * * *." The ruling by the court was of its own motion. Neither side objected to it. In an earlier case of Sharon v. Minnock, 6 Nev. 377, 384 (1871), this court said: "This presumption of a waiver of a right, or assent to an irregularity, from a failure to interpose objection at the proper time, is universally recognized by the courts, and applied to every step taken in an action, from the beginning to the end." See also Ramsey v. Mading, 217 P.2d 1041 (Wash. 1950).

Appellant next contends that it was error for the trial court to allow respondent to put in evidence the book net worth of appellant of $1,679,214,312.40. Although punitive damages were sought, the jury did not return an award for that type of damages. It is proper, where evidence supports the theory of punitive damages, to allow the introduction of the financial position of the defendant. Miller v. Schnitzer, 78 Nev. 301, 371 P.2d 824 (1962); Porter v. Funkhouser, 79 Nev. 273, 382 P.2d 216 (1963). Furthermore, the court in instruction No. 42 instructed the jury as to the purpose for which the book net worth of appellant was admitted in evidence. That instruction reads: "The net worth evidence that has been presented to you may be considered only on the question of assessing punitive damages and must not be considered in the question of assessing compensatory damages. The jury is presumed to give effect to each of the instructions. Parker v. De Bernardi, 40 Nev. 361, 164 P. 645 (1917). We see no error.

Next the appellant claims that the award of compensatory damages in the sum of $134,737.45 was so excessive as to be shocking. It appears that in only five cases has this court reversed a compensatory verdict in a personal injury case on the basis that the verdict was excessive, the last reversal being in 1914.

In the following cases this court has held that verdicts in this type of case are not excessive: Solen v. V.&T. R.R. Co., 13 Nev. 106 (1878); Schafer v. Gilmer, 13 Nev. 330 (1878); Wedekind v. Southern Pacific, 20 Nev. 292, 21 P. 682 (1889); Strozzi v. Wines, 24 Nev. 389, 55 P. 828, 57 P. 832 (1899); Powell v. N. C. & O. Ry., 28 Nev. 40, 78 P. 978 (1904); Murphy v. Southern Pacific, 31 Nev. 120, 101 P. 322 (1909); Burch v. Southern Pacific, 32 Nev. 75, 104 P. 225 (1909); Forrester v. Southern Pacific, 36 Nev. 247, 134 P. 753 (1913); Bawden v. Kuklinski, 48 Nev. 181, 228 P. 588 (1924); Nicora v. Cerveri, 49 Nev. 261, 244 P. 897 (1926); Anderson v. Snell, 57 Nev. 78, 83, 62 P.2d 703

(1936); Babcock and Wilcox Co. v. Nolton, 58 Nev. 133, 71 P.2d 1051 (1937); J. C. Penney Co. v. Gravelle, 62 Nev. 434, 144 P.2d 487 (1945); Slack v. Schwartz, 63 Nev. 47, 161 P.2d 345 (1945); Wells, Inc. v. Shoemake, 64 Nev. 57, 177 P.2d 451 (1947); Hospital Assn. v. Gaffney, 64 Nev. 225, 180 P.2d 594 (1947); Campbell v. Baskin, 69 Nev. 108, 242 P.2d 290 (1952); Schatz v. Devitte, 75 Nev. 124, 335 P.2d 783 (1959); Novack v. Hoppin, 77 Nev. 33, 359 P.2d 390 (1961); Sierra Pacific v. Anderson, 77 Nev. 68, 358 P.2d 892 (1961); Miller v. Schnitzer, 78 Nev. 301, 371 P.2d 824 (1962); Porter v. Funkhouser, 79 Nev. 273, 382 P.2d 216 (1963); Meagher v. Garvin, 80 Nev. 211, 391 P.2d 507 (1964).

This court has from time to time stated reasons why it was reluctant to substitute its judgment for the wisdom of the trier of fact on the amount of damages. In Burch v. Southern Pacific, 32 Nev. 75, 104 P. 225 (1909), it is stated, "This court, recognizing the solemnity of the verdict of twelve jurors, to whom under our system of jurisprudence, is awarded the special province of determining the amount of compensation which should be given a plaintiff, has, very succinctly we believe, laid down the proper rule for appellate courts to follow in consideration of verdicts, in the following language: 'There being no absolute fixed legal rule of compensation, appellate courts ought not to interfere with a verdict, unless it clearly appears that there has been such a mistake of the principles on which the damages were estimated, or some improper motive or bias indicating passion or prejudice upon the part of the jury.'" Also in Forrester v. Southern Pacific, 36 Nev. 247, 134 P. 753 (1913), this court said: "The amount awarded by the jury is large, and we have considered carefully whether it ought to be set aside or reduced. In actions for damages in which the law provides no legal rule of measurement it is the special province of the jury to determine the amount that ought to be allowed, and the court is not justified in reversing the case or granting a new trial on the ground that the verdict is excessive, unless it is so flagrantly improper as to indicate passion, prejudice or corruption in the jury." In Brownfield v. Woolworth Co., 69 Nev. 294, 248 P.2d 1078 (1952), it was held, "This is not a case where the monetary extent of damage can be calculated by reference to some objective standard and thus ascertained as matter of law. The elements of pain and suffering are wholly subjective. It can hardly be denied that, because of their very nature, a determination of their monetary compensation falls peculiarly within the

province of the jury. * * * We may not invade the province of the fact-finder by arbitrarily substituting a monetary judgment in a specific sum felt to be more suitable. * * *"

We also said in Sierra Pacific Power Co. v. Anderson, 77 Nev. 68, 358 P.2d 892 (1961), "* * * This point necessarily falls within the foregoing rulings. This clearly is a case where substantial evidence of a conflicting nature was before the jury, no prejudicial errors of law were made; and the verdict of the jury must and should be upheld." In Miller v. Schnitzer, supra, we further said: "* * * The monetary extent of damage cannot be calculated by reference to an objective standard. The extent of such damage, by its very nature, falls peculiarly within the province of the trier of fact, in this case a jury. * * * The core of the matter seems to be that an appellate court will disallow or reduce the award if its judicial conscience is shocked; otherwise it will not. * * *"

Appellant next contends that nowhere in Nevada law is there a case with comparable injuries resulting in a similar verdict. While not precisely in point, we feel the case of Meagher v. Garvin, 80 Nev. 211, 391 P.2d 507 (1964), is in a reasonable sense comparable in fact and in damages awarded.

Finally, appellant complains that the verdict must be set aside because it awarded compensatory damages against the Southern Pacific Railroad Company and against no others.

Appellant contends that the circumstances must be regarded as a favorable finding with respect to the engineer, the foreman and the switchmen. It cites the case of Wright v. Safeway Stores, 109 P.2d 542 (Wash. 1941), which says: "We are of the opinion that, by returning a verdict against Safeway Stores only, the jury indicated that they did not find for the plaintiff and against the defendant Weiuman just as plainly as though they had made an affirmative finding to that effect."

Appellant then argues that since the jury did not find against the engineer, the foreman and the switchmen, it in substance found them free from negligence which in turn would exonerate the railroad because thereupon respondent was, as a matter of law, guilty of contributory negligence. However, the law does not support that position. In Brokaw v. Black-Foxe Military Institute, 231 P.2d 816 (Cal. 1951), quoting from Irelan-Yuba etc. Min. Co. v. Pacific Gas & Electric, 116 P.2d 611, 619 (Cal. 1941), it is written: "It is well settled that a verdict against one of two defendants but which is silent as to the other defendant is not a verdict in favor of the latter but is merely a failure on the part of the jury to find upon all of the issues."

Furthermore, when a verdict is sought against a defendant corporation on dual theories of liability, the release of employees-defendant does not release the corporation. We said in Novack v. Hoppin, 77 Nev. 33, 359 P.2d 390 (1961): "The issues formed by the pleadings, and the evidence at the trial, together with the instructions given, were such as to permit the entry of a judgment in favor of Hoppin and against Novack, independent of any application of the doctrine of respondent superior. * * * [T]he jury had before it evidence pertaining to the issue of negligence on the part of Novack * * *. As we conclude that there was substantial evidence that Novack's independent negligence was a proximate cause of the accident, the verdict for compensatory damages in favor of Hoppin and against Novack must be sustained. * * *" The same circumstance is true here. The jury could well have fixed liability upon the railroad because of its maintenance, after notice to it, of a dangerous condition of the crossing proximately resulting in injury to respondent.

Finally appellant contends that the combination of errors noted above prejudice the substantial rights of appellant. It contends that some, standing alone, require a reversal of the judgment. It further contends that taken together they explain the enormous size of the verdict against appellant and demonstrate that appellant was in effect denied a fair trial. We feel there is no merit to the assigned errors, individually or collectively.

The judgment is affirmed.

ZENOFF, J., and MENDOZA, D. J., concur.

THOMPSON, C. J., being disqualified, the Governor commissioned Honorable John F. Mendoza of the Eighth Judicial District to sit in his place.